**Francis M. FIORILLO, Petitioner,**

v.

**U.S. DEPARTMENT OF JUSTICE, BUREAU OF PRISONS, Respondent.**

**Appeal No. 85–1955.**

United States Court of Appeals, Federal Circuit.

July 2, 1986.

Bruce M. Stark, of Long Beach, Cal., argued for petitioner.

Linda Maramba, Dept. of Justice, of Washington, D.C., argued for respondent. Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, Thomas W. Petersen and Sara V. Greenberg, Commercial Litigation Branch, Dept. of Justice, of Washington, D.C., were on the brief for respondent. George M. Beasley, III, Dept. of Justice, of Washington, D.C., entered an appearance for respondent.

Before DAVIS, Circuit Judge, MILLER, Senior Circuit Judge, and NEWMAN, Circuit Judge.

JACK R. MILLER, Senior Circuit Judge.

Francis M. Fiorillo petitions for review of an arbitration decision, FMCS No. 83K/26986, November 14, 1984 (Chance, Arbitrator), in which the arbitrator sustained the action of the Bureau of Prisons ("agency") suspending and demoting petitioner. We affirm.

## BACKGROUND

None of the facts is in dispute. Petitioner, the grievant below, is a Correctional Officer with the agency at the Federal Correctional Institute at Terminal Island, California. Before July 24, 1983, he was a Senior Officer Specialist, GS 007–8. A Senior Officer Specialist has contact with many inmates and works independently with only a minimum of supervision and at times trains and supervises lower level correctional officers. A Senior Officer, the position to which petitioner was demoted, has fewer responsibilities and a commensurate lower salary, GS009–7.

For several years prior to the conduct which is the basis of the agency's adverse action, petitioner had made some allegations of impropriety on the part of the supervisory staff of the prison, both privately (to prison and other federal officials) and to the press. Some of the statements were determined to be well-founded and some were found not to be; petitioner was disciplined at least once for an ill-founded allegation. It is not contested that during those years there were allegations (by persons other than petitioner) of wrongdoing at the prison which were made public and that such public allegations were not uncommon.

Beginning in the fall of 1982, petitioner made requests for a regular assignment to an "outside" post to alleviate a high blood pressure condition chronicled by both the prison medical staff and petitioner's private physician. (Such a post apparently involves the patrol of the perimeter of the prison to watch for attempted escapes and requires little contact with inmates and other staff and no supervisory responsibilities.) On November 4, 1982, petitioner asked the warden, Jerry T. Williford, for assignment to an outside post because he believed that there was a conspiracy among the staff to "frame or discredit" him and because the prison's medical staff had recommended that he seek medical attention for his high blood pressure. Williford placed petitioner on leave with pay stating that he was concerned about the effectiveness of petitioner's performance of his duties.

On November 11, 1982, petitioner submitted a letter from his private physician stating that petitioner suffered from high blood pressure and that, if petitioner were to retain his then-present assignments, his health would be put at risk. The next day, Williford ordered petitioner to submit to medical and psychiatric fitness-for-duty examinations. All of these were negative, although the agency-designated psychiatrist suggested that petitioner be maintained at the outside post to be removed from staff involved with petitioner in a pending lawsuit.

On December 23, 1982, the acting warden ordered petitioner back to duty with no

restrictions. On March 23, 1983, petitioner again requested, and was denied, duty at an outside post. On April 1, 1983, petitioner's physician gave petitioner a letter stating that he had examined petitioner and "placed him on total disability until May 2, 1983. My diagnosis . . . is Hypertension, which is definitely job-related." Although the physician would not give Williford information concerning petitioner over the phone, he agreed to answer the warden's questions posed in writing. However, he never responded when these were sent to him on May 27, 1983.

On April 26, 1983, petitioner initiated litigation in the United States District Court for the Central District of California[1] against the Bureau of Prisons and individual prison employees, alleging improper, retaliatory discipline by the agency (placing him in "locations at [Terminal Island] which would be more stressful than the already stressful location" in which he was working). He alleged that this action resulted in "career impairment" arising in part from the agency's failure to respond to alleged examples of "corruption" he had discovered in the prison and had disclosed. While off-duty, he informed the press of his action, and, on April 27, five or six local papers published articles about his case including some disparaging comments by him about the prison, the staff in general, and his chances for career advancement.

On May 4, 1983, while petitioner was on approved sick leave, he hand-delivered two memoranda to the warden concerning alleged incidents that occurred at the facility in 1980 and 1982. Afterwards, he visited and spoke with several of the staff while they were on duty.

On June 13, 1983, the warden gave notice to petitioner of his proposed suspension and demotion to Senior Officer, based on three charges: (1) misuse of sick leave, (2) unwillingness to perform his job, and (3)

conduct which undermines the efficient operation of the institution. With respect to the latter, *three specifications* were stated in support of the proposed adverse action: first, that petitioner's visit with other staff members (while he was on approved sick leave) was distractive and caused them to be inattentive to their duties; second, that petitioner had asserted that some of the other staff members were conspiring to discredit him; and third (the decisive issue here), in the warden's words,

> [o]n April 27, 1983, two local newspapers published articles in which you were quoted expressing your personal opinions about the integrity of staff of this institution and about your own chances for promotion. Your statements reflect negatively on this institution and damage the public's confidence in our ability to carry out our mission. Further, Program Statement 1480.2[2] and Institution Supplement 1480.2, both prohibit staff members from releasing information to the news media. I am aware that you have initiated contact with representatives of the press on several occasions and offered your personal opinions about operations and management of this institution. Your actions are a violation of Federal Prison System policies on contacts with the news media and they are also in direct violation of my specific instructions to all staff at a general recall that staff members are not to contact the news media unless specifically designated by me to make such contact.

> By expressing your personal opinions for publication, you have also refused to conform with Federal Prison System standards of employee conduct which require you to avoid any action which might reflect adversely on the Government.[3]

Later in the same notice, Williford stated that:

---

**1.** CV 83–2612 R, subsequently dismissed September 17, 1984.

**2.** Program Statement 1480.2 refers to inmate conduct and is clearly inapt. We do not discuss it further.

**3.** The implicit citation here is to Program Statement 3420.5, discussed *infra.*

The allegations you have made have all been thoroughly investigated by this and other agencies. Your refusal to accept the results of the investigations and your continuing to raise these issues forms the basis for this charge.

Also in the same notice was the warden's statement that:

Your actions which have undermined the efficient operation of the institution demonstrate that you have not been supportive of this or previous administrations. Federal employees have numerous appeal procedures which can be used to resolve complaints, yet you have chosen to air your grievances in a public forum which has reflected negatively on this facility and the integrity of its staff.... [B]y your actions specified in these charges, you have not demonstrated ... required personal qualities.

On July 19, 1983, the Regional Director of the agency sustained the charges alleged by Williford, stating:

After careful consideration, I find the charges sustained and fully supported by the evidence in the adverse action file.... Your actions in this matter have damaged your credibility and effectiveness as a correctional worker and I believe these actions will have the desired corrective effect.

Petitioner's suspension and demotion were effective July 24, 1983. He then grieved his case, pursuant to the negotiated grievance procedures provided in his union's collective bargaining agreement with the agency, and the matter was assigned for arbitration.

The arbitrator denied petitioner's grievance. However, he explicitly refused to sustain the first and second agency charges above relating to petitioner's sick leave misuse and his alleged unwillingness to perform his job. With respect to the first charge, the arbitrator concluded that it "was not only based upon a *de minimis* act, but is contrary to the Agency's own operating instructions and is not a valid reason for suspension or demotion." Regarding the second charge, the arbitrator concluded that although petitioner "demonstrated a continuing *reluctance* to continue his inside assignments ... he was within his contractual rights to do so, and could reasonably expect ... consideration for what his physician concluded was a job-related illness." The agency has not cross-appealed from the decisions on those charges.

With respect to the third charge, the arbitrator discussed petitioner's contention that the First Amendment protected his statements to the press and that the adverse action was a reprisal for petitioner's "whistleblowing," concluding that—

[t]he Agency did clearly established [sic], with a preponderance of evidence, that its action in suspending and demoting the grievant was for such cause as would promote the efficiency of the service, because, (1) he failed to comply with the Standards of Conduct, and (2) he was relieved of some of the specific duties which separates [sic] a Senior Officer from a Senior Officer Specialist.

## OPINION

Petitioner's suspension and demotion by the agency were taken under Chapter 75 of Title 5 of the United States Code. Section 7513(a) provides in pertinent part that an agency may take a disciplinary action covered by the subchapter against an employee "only for such cause as will promote the efficiency of the service." Chapter 77 of the same title, covering appeals from an employee's adverse action under Chapter 75, applies to an appeal before either the Merit Systems Protection Board ("board") or, as in this case, an arbitrator. Section 7701(c) provides that the agency bears the burden of proof in a Chapter 75 adverse action by a preponderance of the evidence. However, section 7701(c) further provides that:

(2) [T]he agency's decision may not be sustained ... if the employee ...

....

(B) shows that the decision was based on any prohibited personnel practice described in section 2302(b) of this title; or

(C) shows that the decision was not in accordance with law.

■ Chapter 23 of Title 5, section 2302(b) sets forth prohibited personnel practices. The one relied upon by petitioner (subsection (8)) prohibits an agency from taking a personnel action in reprisal for:

(A) a disclosure of information by an employee ... which the employee ... reasonably believes evidences—

(i) a violation of any law, rule, or regulation, or

(ii) mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety,

if such disclosure is not specifically prohibited by law ....

This court's review of decisions by an arbitrator, as with those by the board, is limited.[4] We may not arbitrarily substitute our views for those of the arbitrator, but must affirm unless we determine that the agency's decision is unsupported by substantial evidence or is not in accordance with law. 5 U.S.C. § 7703(c) (1982); *Hayes v. Department of the Navy*, 727 F.2d 1535, 1537 (Fed.Cir.1984).

As related above, only one charge of the three asserted was sustained by the arbitrator. Moreover, it can be inferred that, by ignoring two of the three specifications alleged to support that charge, the arbitra-

tor did not find them supported by substantial evidence.[5] In addition, the arbitrator's action in sustaining the charge was erroneously based, in part, on an allegation neither proposed nor supported by the agency, viz., that the action was supported because petitioner "was relieved of some of the specific duties which separates [sic] a Senior Officer from a Senior Officer Specialist."[6] Therefore, the issues proposed by the parties are limited to (1) whether the arbitrator's decision sustaining the suspension and demotion of petitioner (based solely on petitioner's failure to comply with the agency's standards of conduct by his statements to the press) is unsupported by substantial evidence or is not in accordance with law, 5 U.S.C. § 7703(c), and (2) whether the arbitrator incorrectly found petitioner's disclosures to the press to be unprotected speech under the First Amendment and, therefore, not afforded protection against reprisal by the agency under 5 U.S.C. § 2302(b)(8)(A).

The standards referred to in the notice of proposed removal and in the arbitrator's decision (which standards apply to employees in petitioner's position and were in effect well before June 13, 1983) are as follows:

*Department of Justice Federal Prison System Institution Supplement No. TRM 1480.2B*

---

4. An arbitrator applies the same substantive rules as the board. Accordingly, we apply the same standards of review of an arbitrator's decision as those applicable to an appeal from the board. *DePauw v. United States Int'l Trade Comm'n*, 782 F.2d 1564, 1565 n. 2 (Fed.Cir. Jan. 30, 1986).

5. The agency does not contend that subsequent to the publication of the arbitrator's opinion it made any attempt to have the arbitrator amend the opinion and decision with respect to these two specifications. Despite this failure, in its main brief before this court the Department of Justice asserts that each of the three specifications alleged to support the third charge was "properly supported by substantial evidence." Were this so, it is unlikely that the arbitrator would have ignored or forgotten to mention them. Furthermore, it appears that the agency implies that, by failing to address those specifi-

cations in this court, petitioner has waived his right to overcome a determination based upon them. Petitioner has *no* burden here to contest determinations *not* made by the arbitrator.

6. We do not find this assertion anywhere in the arbitrator's summary of the agency's position. Also, there is evidence of record which indicates that *all* or *most* correctional officers were rotated every several months between "inside duties" and "outside duties," such that Senior Officer Specialists would routinely perform, on a temporary basis, duties normally assigned to Senior Officers. Letter dated Dec. 14, 1982 of D.H. Wilson, M.D., to P. Caplinger, Personnel Officer U.S. Department of Justice Federal Prison System, Federal Correctional Institution, Terminal Island, at p. 3. It appears that the arbitrator confused the evidence proposed for each charge.

1. *PURPOSE.* To establish institution procedures to implement national policy regarding contacts with the news media.

. . . .

3. *RELEASE OF INFORMATION.*

a. The Warden at Terminal Island, or the Executive Assistant to the Warden as Public Information Officer, is solely responsible for contact with the press. Other staff members shall refer all press inquiries to the office of the Warden or Executive Assistant. No other staff member is permitted to release information to members of the media on behalf of the institution.

and

*Department of Justice Federal Prison System Program Statement No. 3420.5*

. . . .

6. *POLICY:* ... In general, the FPS expects its employees to conduct themselves in such a manner that their activities both on and off duty will not discredit either themselves or the agency.

[E]mployees shall:

a) Conduct themselves in a manner that creates and maintains respect for the Department of Justice and the U.S. Government. In all their activities, personal and official, they should always be mindful of the high standards of behavior expected of them.

b) Avoid any action which might result in, or create the appearance of, affecting adversely the confidence of the public in the integrity of the Government.

c) Discuss with their immediate superiors any problems arising in connection with matters within the scope of this policy.

We need not consider the statement in Warden Williford's notice of proposed removal regarding petitioner's alleged violation of the warden's "specific instructions to all staff at a general recall," because (a) the arbitrator did not address the statement; (b) the contention is not supported by any evidence of record that we can find; and (c) the parties do not address the statement in their briefs.

■ The Institution Supplement TRM No. 1480.2B does not purport to address the activity it is alleged to ban in this case. It speaks to the dissemination of material to the press "on behalf of the institution." However, petitioner's statements to the press were clearly not made "on behalf of the institution," nor has the agency so alleged. Therefore, the agency's allegation that petitioner violated this Institution Supplement is not supported by the evidence.

What remains to support petitioner's suspension and demotion is the "policy" enunciated in Program Statement No. 3420.5. This broadly prohibits conduct "which might result in, or create the appearance of, affecting adversely the confidence of the public in the integrity of the Government." To this end, employees are expected "to conduct themselves in such a manner that their activities both on and off duty will not discredit either themselves or the agency."

In the context of an adverse action against a public employee, the rights under section 2302(b)(8)(A) (prohibition of reprisal) and the First Amendment's right to free speech have been considered coextensive rights. *See Gerlach v. Federal Trade Commission,* 8 M.S.P.B. 599, 9 M.S.P.R. 268 (1981). *Cf. Jurgensen v. Fairfax County,* 745 F.2d 868, 877–78 (4th Cir.1984) (employee's reprisal defense was not section 2302(b)(8) *per se*). Because the agency is not competent to determine the constitutionality of a rule, regulation, or statute, *Malone v. Department of Justice,* 13 M.S.P.B. 81, 14 M.S.P.R. 403, 406 (1983), the decision at the board (or at the arbitrator) level is necessarily based upon evaluation of the employee's actions in light of the applicable rules and regulations, and our review of the arbitrator's decision is limited by 5 U.S.C. § 7703(c).

In this case, the arbitrator considered a Supreme Court opinion that discusses the limitations on a public employee's right of free speech. *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). More recently, the

Court elaborated upon *Pickering* in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), which also discusses the First Amendment rights of a government employee. To establish a cause of action under the First Amendment, a public employee must demonstrate "(1) that the speech complained of qualified as protected speech ... and (2) that such protected speech or activity was the 'motivating' or 'but for' cause for his ... demotion." *Jurgensen*, 745 F.2d at 878; *Gerlach*, 9 M.S.P.R. at 271 (both citing *Mount Healthy City School Board v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)). *See* 5 U.S.C. § 7701(c)(2)(B)). If the "speech" is not protected, it is unnecessary to scrutinize the reasons for the demotion. *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689. Neither party here contests that petitioner's communications to the press were the "motivating" cause of his demotion.

In determining whether the "speech" is protected, the task of the reviewer is "to seek 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " *Id.* at 142, 103 S.Ct. at 1687 (citing *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35). If petitioner's public condemnation of the administration of Terminal Island is " 'a matter of legitimate public concern' upon which 'free and open debate is vital to informed decisionmaking by the electorate,' " *id.* at 145, 103 S.Ct. at 1689 (citing *Pickering*, 391 U.S. at 571–72, 88 S.Ct. at 1736), censure by the agency in the form of suspension and demotion cannot be condoned; whereas, if he spoke "upon matters only of personal interest, absent the most unusual circumstances," this court "is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency." *Id.* at 147, 103 S.Ct. at 1690 (citation omitted).

■ "Whether an employee's speech addresses a matter of public concern must be determined by [its] content, form, and context ... as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690 (footnote omitted). In addition, to be given "whistleblower" status and thus the protections under 5 U.S.C. § 2302(b)(8), the *primary* motivation of the employee must be the desire to inform the public on matters of public concern, and not personal vindictiveness. *See* 461 U.S. at 148, 103 S.Ct. at 1690. Here, the newspapers that quoted petitioner related his allegations (a) that a female inmate and a female employee were sexually attacked five years previously, (b) that breaches of national security had existed in the prison, and (c) that "the prison is still 'saturated with corruption.' " We are satisfied that the arbitrator did not err in determining that the record as a whole indicated that "the grievant's motive for releasing such generalized and objurgatory statements to the press was for personal reasons and not to inform the public of matters of general concern," so that petitioner was not entitled to protection as a "whistleblower" under section 2302(b)(8). Although portions of petitioner's "speech" to the press were related to items about which the public was concerned in years past, the "news" was stale, and the newspaper articles were essentially the airings of petitioner's personal complaints. Mere publication does not clothe them with First Amendment protection.

■ Petitioner's attempt to parse the transmitted information to demonstrate that the "personal" attributes attached only to one or two sentences of the information miss the mark. It is the nature of the whole communication that must be reviewed to determine whether it is of "public concern"—not sentences taken in isolation. In this case, petitioner's press conferences as a whole "reflect one employee's dissatisfaction with [his supervisor] and an attempt to turn that displeasure into a cause celebre." *Connick*, 461 U.S. at 148, 103 S.Ct. at 1691 (footnote omitted). A complaint "not otherwise of public concern does not attain that status because its subject matter could, in different circumstanc-

es, have been the topic of a communication to the public that might be of general interest." *Id.* at n. 8.

In applying the balancing test, the *Connick* Court stated that it is not necessary for the agency to prove that the efficiency of the service would be promoted by the employee's adverse action, but only that, under the circumstances, the potential harm is reasonably apprehensible. 461 U.S. at 151–52, 103 S.Ct. at 1692. In this case, the agency has demonstrated that petitioner possesses a propensity for making at least some baseless public allegations against the agency. The agency was not unreasonably concerned that petitioner's statements would have adversely affected the discipline and morale at Terminal Island. Under the circumstances, deference to the agency's judgment is appropriate. 461 U.S. at 151–52, 103 S.Ct. at 1692. Accordingly, we cannot fault the arbitrator's determination that petitioner's suspension and demotion would promote the efficiency of the service.

In view of the foregoing, the agency's action in suspending and demoting petitioner is *affirmed.*[7]

AFFIRMED.

DAVIS, Circuit Judge, concurring.

I join in Judge Miller's opinion, and the result, because the record shows, to me (as it did to the arbitrator[1]), that (a) petitioner deliberately and primarily made his comments to the media for personal motives of vindictiveness due to his failure to be promoted and his belief he could never be promoted (*see, e.g.,* the Los Angeles Times article reprinted as Appendix A to Judge Newman's opinion); and (b) this concentration on petitioner's own personal situation,

taken together with the personal and revengeful purpose for communicating the individual matters to the press, so dominated what public character these communications might otherwise have had as to deprive them of First Amendment and "whistleblower" protection. On this record, the private and personal was so dominant, and so intermixed with the public matters, that the public parts of the communications cannot be treated as if they stood alone.

NEWMAN, Circuit Judge, dissenting.

I respectfully dissent. The agency wrongfully suspended and demoted Mr. Fiorillo from his position as a GS–8 Correctional Officer, in contravention of the right of freedom of speech guaranteed by the First Amendment to the Constitution, and in contravention of 5 U.S.C. §§ 2302(b)(8)(A) and 7701(c)(2)(B).

Mr. Fiorillo discussed with the press his suit against the government, a matter that received substantial press attention. The protected nature of the suit was conceded before the arbitrator, and remains unchallenged before us. The matters reported by the press were plainly of public concern or interest. Mr. Fiorillo's statements were not shown to have disrupted the efficient operation of the Terminal Island prison. They were the motivating cause of his suspension and demotion. Under these circumstances and consistent with law and precedent, Mr. Fiorillo's freedom to speak on these matters, without punishment or reprisal, is a protected fundamental right.

I.

*The Agency Regulations*

The agency's suspension and demotion of Mr. Fiorillo was grounded on the asserted

---

**7.** The dissenting opinion's statement that the majority decision "will have a chilling effect" on any employee who speaks out on issues of public concern simply ignores the factual premise of the majority decision. Its further statement that the majority decision does not protect free speech if the employee can be shown to have *any* personal motivation for speaking is a clear distortion of the majority opinion and the opinion in *Connick v. Myers, supra.*

**1.** The arbitrator said:

"The arbitrator is convinced that the grievant's motive for releasing such generalized and objurgatory statements to the press was for personal reasons and not to inform the public of matters of general concern...."

violation of certain regulations of the Bureau of Prisons, as set forth in the notice of proposed adverse action. Although several other charges were initially made in the agency's notice of proposed adverse action, only one specification of one charge was upheld by the arbitrator.[1] The charge was "conduct which undermines the efficient operation of the institution". The specification on which Mr. Fiorillo was dismissed, reproduced below, does not mention his lawsuit, filed the day before the newspaper articles appeared, but states that Mr. Fiorillo expressed his "personal opinions" to the press, contrary to agency policy, and continued to raise allegations that had been "thoroughly investigated" by the agency. The notice states:

> On April 27, 1983, two local newspapers published articles in which you were quoted expressing your personal opinions about the integrity of staff of this institution and about your own chances for promotion. Your statements reflect negatively on this institution and damage the public's confidence in our ability to carry out our mission. Further, Program Statement 1480.2 and Institution Supplement [TRM] 1480.2[B], both prohibit staff members from releasing information to the news media. I am aware that you have initiated contact with representatives of the press on several occasions and offered your personal opinions about operations and management of this institution. Your actions are a violation of Federal Prison System policies on contacts with the news media and they are also in direct violation of my specific instructions to all staff at a general recall that staff members are not to contact the news media unless specifically designated by me to make such contact.
>
> By expressing your personal opinions for publication, you have also refused to conform with Federal Prison System standards of employee conduct [Program Statement 3420.5] which require you to avoid any action which might reflect adversely on the Government.
>
> As an employee of this agency, it is certainly your obligation to report to management any possible violation of law or regulation of which you become aware. However, once you have reported the information, you have fulfilled that obligation and it is not your role to investigate further or to dispute the action that management takes as a result of your report. The allegations you have made have all been thoroughly investigated by this and other agencies. Your refusal to accept the results of the investigations and your continuing to raise these issues forms the basis for this charge.

The first paragraph of the above notice is not accurate in its description of the cited regulations. Program Statement 1480.2 does not "prohibit staff members from releasing information to the news media"; it regulates only communications between prisoners and the news media. Institutional Supplement TRM 1480.2B is also mis-described, as it expressly relates only to releases by staff members "on behalf of the institution"; the agency does not assert that Mr. Fiorillo's statements were on behalf of the Bureau of Prisons, or that the press was misled into such a belief. The agency action purportedly based on these two regulations finds no support at all in the authority relied on.

Thus the action taken against Mr. Fiorillo must derive its authority solely from Program Statement 3420.5:

> 6. *POLICY*: ... In general, the FPS [Federal Prison System] expects its employees to conduct themselves in such a

---

**1.** The arbitrator rejected as *de minimus* the charge of abuse of one hour of sick leave, wherein Mr. Fiorillo was charged with talking with other staff members, and stated that "no evidence" supported the charge that Mr. Fiorillo "was unwilling or failed to acceptably support his job". The arbitrator did not discuss the charge that Mr. Fiorillo gave the Warden on May 4, 1983 a memorandum concerning an old and assertedly settled matter, which the Warden said "undermines the efficient operation of the institution". None of these charges is before us on appeal, although the government's brief discusses them at length, stating erroneously that two were "proved ... before the arbitrator".

manner that their activities both on and off duty will not discredit either themselves or the agency.

... [E]mployees shall ...

b) Avoid any action which might result in, or create the appearance of, affecting adversely the confidence of the public in the integrity of the Government.

The last paragraph of the notice refers to Mr. Fiorillo's "continuing to raise" issues that the agency wished to close, and that this persistent whistleblowing "forms the basis for this charge." The "charge" appears to be violation of this policy statement against actions that might reflect adversely on the agency or the government. Although Mr. Fiorillo's lawsuit was not mentioned, it was uncontroverted that this was the reason for the newspaper articles. It is not clear whether the asserted policy violation was attributed to the newspaper articles, the lawsuit, or the whistleblowing itself; but it is clear, as will be discussed in Part II, that these are protected activities. It is equally clear, as will be discussed, that an employee's motive does not convert otherwise protected activities into unprotected activities.

Although the arbitrator ruled that this regulation "is not so overly broad as to unconstitutionally abridge First Amendment rights", Program Statement 3420.5 is typical of those governmental regulations that have been struck down as exceeding permissible restraints on employee speech. The government's interest "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved". *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960). The law does not tolerate statutes or regulations "patently capable of many unconstitutional applications, threatening those who validly exercise their rights of free expression". *Smith v. California*, 361 U.S. 147, 151, 80 S.Ct. 215, 217, 4 L.Ed.2d 205 (1959), *reh'g denied*, 361 U.S. 950, 80 S.Ct. 399, 4 L.Ed.2d 383 (1960). As was stated in *N.A.A.C.P. v. Button*, 371 U.S. 415, 432–33, 83 S.Ct. 328, 337, 9 L.Ed.2d 405 (1963), a regulation

may be invalid if it prohibits privileged exercises of First Amendment rights whether or not the record discloses that the petitioner has engaged in privileged conduct.... The objectionable quality of vagueness and overbreadth [depends] upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a [regulation] susceptible of sweeping and improper application. These freedoms are delicate and vulnerable, as well as supremely precious in our society.

[citations and footnote omitted]. *See also Zwickler v. Koota*, 389 U.S. 241, 250, 88 S.Ct. 391, 396, 19 L.Ed.2d 444 (1967).

The agency's application of Program Statement 3420.5 against Mr. Fiorillo illustrates its potential for "sweeping and improper application", in that the regulation was invoked to punish Mr. Fiorillo for talking about, and pursuing, otherwise protected activities. Program Statement 3420.5 expressly prohibits all criticism of the Government regardless of the context, forum, or public interest served. The regulation does not distinguish between public action and private action, as the regulations apply equally to "on and off duty" actions. It appears to prohibit all public exposure of agency functions which may be conducted inefficiently or corruptly, a matter expressly encouraged in the national interest by the Civil Service Reform Act. *See* II. C., *infra*.

Similarly broad regulations curtailing police officers have been consistently struck down as unconstitutional. The Seventh Circuit in *O'Brien v. Town of Caledonia*, 748 F.2d 403 (7th Cir.1984), invalidated rules prohibiting conduct which "evince disrespect, discourtesy or criticism" of a supervisory or fellow officer. The Seventh Circuit also invalidated a police department rule which barred policemen from engaging in any activity which was "derogatory" to the department or to any member or policy thereof, and a disciplinary board order requiring that policemen "desist from any derogatory comments reflecting on the

image or reputation of the Chicago Police Department". *Muller v. Conlisk*, 429 F.2d 901 (7th Cir.1970). In *Flynn v. Giarrusso*, 321 F.Supp. 1295 (E.D.La.1971), the court struck down regulations prohibiting, *inter alia*, criticism concerning "the conduct of departmental functions". The court said:

> The point is that these regulations sweep far broader than necessary to advance the legitimate interests of the police department as an employer. An officer's speech is so subject to the restraints of either prior approval by superiors or subsequent discipline, restraints which are left to the unfettered discretion of enforcing police officials, that we fail to see how an officer can exercise his First Amendment rights rationally and intelligently. As police officers "steer far wider of the unlawful zone," [*Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460, *reh'g denied*, 358 U.S. 860, 79 S.Ct. 12, 3 L.Ed.2d 95 (1958)] the public, for whose benefit the Constitution protects many types of speech, is bound to suffer, and this is impermissible.

*Id.* at 1300–01 (footnote omitted). *See also Bridgeport Guardians, Inc. v. Delmonte*, 553 F.Supp. 601, 618 (D.Conn.1983) (regulation prohibiting police officers from speaking or writing "critically or derogatorily of other members of the Department" held impermissibly overbroad).

The Bureau of Prisons Program Statement 3420.5 is not only an impermissible restraint on First Amendment rights, but is so vague and indefinite that it can not be objectively enforced. As the Supreme Court stated, a statute or regulation "which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law". *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). In order to prevent arbitrary and discriminatory enforcement "on an *ad hoc* and subjective basis", a regulation "must provide explicit standards for those who apply them".

*Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972).

Program Statement 3420.5 proscribes conduct that *might* adversely affect "the confidence of the public in the integrity of the Government". The language of this regulation does not except constitutionally or statutorily protected activity. I an unable to determine how this regulation can be objectively interpreted by those correctional officers who must abide by it, by Bureau of Prisons officials who must enforce it, and by courts that must review any disciplinary proceedings. This vague rule could be applied to deter or punish the exercise of First Amendment freedoms, as in the case of Mr. Fiorillo.

> The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions. Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.

*N.A.A.C.P. v. Button*, 371 U.S. at 432–33, 83 S.Ct. at 338 (citations omitted).

Virtually identical regulations have been overturned by other federal courts as unconstitutionally vague. In *O'Brien*, the Seventh Circuit granted an employee summary relief when he had been removed on the basis of charges that his conduct had caused "serious discredit to the Department and the Town". 748 F.2d at 408. In *Flynn*, the court invalidated on vagueness grounds a regulation requiring police officers to act in accordance with the "highest degree of morality" and to act in a manner which would not "reflect discredit upon himself or the Department". 321 F.Supp. at 1299–1300. *See also Tygrett v. Barry*, 627 F.2d 1279, 1284–85 (D.C.Cir.1980) (invalidating for vagueness the words "enhance the image of the Police Department or aid in carrying out its obligation to the community"); *Bence v. Breier*, 501 F.2d 1185, 1188, 1190 (7th Cir.1974), *cert. denied*, 419 U.S. 1121, 95 S.Ct. 804, 42 L.Ed.2d 821 (1975) (invalidating for vague-

ness the words "conduct unbecoming an officer and detrimental to the service").

There is no basis for a different view of Program Statement 3420.5. To the contrary, the agency used this regulation to punish Mr. Fiorillo for an otherwise protected activity. The regulation itself does not survive First Amendment scrutiny.

## II.

### *The First Amendment*

Freedom of speech is not totally unfettered. Even as it is settled that the government cannot "condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression", *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983), the government as an employer is not totally barred from regulating the speech of its employees. In *Pickering v. Board of Education*, 391 U.S. 563, 569, 88 S.Ct. 1731, 1735, 20 L.Ed.2d 811 (1968), the Supreme Court commented that "[b]ecause of the enormous variety of fact situations in which critical statements by ... public employees may be thought by their superiors ... to furnish grounds for dismissal, we do not deem it either appropriate or feasible to attempt to lay down a general standard against which all such statements may be judged." *See also Connick*, 461 U.S. at 154, 103 S.Ct. at 1694. Rather, each case must be decided on its facts. However, the balance between the interest of the employee in commenting upon matters of public concern, and the interest of the government as an employer in promoting its varied interests, can not be struck in a way that violates the Constitution.

In *Pickering* the Court held that when an employee's comments on matters of public concern are "substantially correct", they cannot furnish grounds for the employee's dismissal unless the government's interest is particularly strong. 391 U.S. at 570, 88 S.Ct. at 1735. In weighing the competing interests of employer and employee, the Court discussed several factors which may be relevant, including (1) the

nature of the employer/employee relationship; (2) the detrimental effect of the employee's statement on the government; and (3) the relationship of the employee to the issue spoken on. *Id.* at 569–73, 88 S.Ct. at 1735–37. Even false statements are subject to the protection of the First Amendment absent a showing that they were "made either with knowledge of their falsity or with reckless disregard for their truth or falsity". *Id.* at 573, 88 S.Ct. at 1737.

In addition, we must consider the effect on Mr. Fiorillo's situation of the so-called whistleblower statute, 5 U.S.C. § 2302(b)(8)(A), and the governmental purpose in enacting that statute.

### A.

A First Amendment analysis of Mr. Fiorillo's criticisms of his governmental employer begins with a determination of whether Mr. Fiorillo's expressions, i.e. his remarks to the press, can "be fairly characterized as constituting speech on a matter of public concern". *Connick*, 461 U.S. at 146, 103 S.Ct. at 1690. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. at 1690 (footnote omitted). Inquiry into the protected status of speech is one of law, not of fact. *Id.* at 148 n. 7, 103 S.Ct. at 1690 n. 7. *See also Brockell v. Norton*, 732 F.2d 664, 667 (8th Cir.1984); *Waters v. Chaffin*, 684 F.2d 833, 837 n. 10 (11th Cir.1982); *Bickel v. Burkhart*, 632 F.2d 1251, 1256 (5th Cir.1980).

Where an employee has, as here, raised a fair defense of protection by the First Amendment, it is essential that the reviewing court conduct a thorough and independent examination of the challenged statements and the circumstances under which they were made. *Connick*, 461 U.S. at 150 n. 10, 103 S.Ct. at 1690 n. 10. No deference was owing to the arbitrator's decision, which the government argues is reviewable only on the "substantial evidence" standard. This court has held that where an

employee was wrongfully suspended and demoted in violation of his constitutional rights, the arbitrator's decision was set aside as "not in accordance with law". *Brown v. Department of Transportation, FAA,* 735 F.2d 543, 546 n. 6 (Fed.Cir.1984) (applying 5 U.S.C. § 7703(c)(1)). *See also Brasslett v. Cota,* 761 F.2d 827, 840 (1st Cir.1985) ("independent review" required of district court's finding that statements were unprotected under the First Amendment); *Tygrett,* 627 F.2d at 1282–83 ("courts are required to conduct an individualized and searching review" of the record); *Porter v. Califano,* 592 F.2d 770, 780 & n. 15 (5th Cir.1979) ("Independent judicial judgment" is required without deference to agency ruling since "courts, not agencies, are expert on the First Amendment").

The government does not contest that Mr. Fiorillo, although a government employee, had the right to file his lawsuit in federal court. The Petition Clause of the First Amendment guarantees Mr. Fiorillo's right to seek redress of asserted legal wrongs.[2] The lawsuit itself is of public record. The press, therefore, absent a supervening governmental interest in excluding the public—an interest not suggested in the record nor argued by the government—has the absolute right to report this public information. *See, e.g., Begg v. Moffitt,* 555 F.Supp. 1344, 1353 (N.D.Ill.1983), and cases cited therein.

The agency's objection, for which it punished Mr. Fiorillo, is that he discussed the issues in his lawsuit with the press. See the notice of proposed adverse action, *supra.*[3] The only evidence in the record of the substance of these discussions is found in the newspaper articles themselves. Accordingly, our focus is on the information contained therein, in evaluating the *Picker-*

*ing* balance between the personal and public interest served by the challenged speech, and the governmental employer's interest in restraint.

The record contains articles from six California newspapers on the subject of Mr. Fiorillo's suit. Two articles are reproduced in the attached appendices, one from the Los Angeles Times and one from the Los Angeles-Herald Examiner. In addition to mentioning and quoting Mr. Fiorillo, the article in the Los Angeles Times reported press contacts with an Assistant U.S. Attorney, with Fiorillo's lawyer, and with his co-plaintiff, and an attempted contact with the prison warden.

The media obviously considered Mr. Fiorillo's suit to be of public interest. These articles reported that convicted Polish spy Marian Zacharski had unlimited phone access at the Terminal Island institution; that convicted spy Christopher Boyce, the subject of the popular book and film "The Falcon and the Snowman", had sent coded information to an address in Tahiti from the prison; that female inmates had been raped or sexually abused by prison employees; and that widespread corruption and malfeasance was ongoing in the institution.

Expression at a public forum has traditionally been viewed as evidence that the subject of the employee's speech is of public concern. *See, e.g., Roseman v. Indiana University of Pennsylvania,* 520 F.2d 1364, 1368 n. 11 (3d Cir.1975), *cert. denied,* 424 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 329 (1976) (if employee "had convinced local news media that her grievance ... was newsworthy, entirely different considerations would come into play"); *McKinley v. City of Eloy,* 705 F.2d 1110, 1115 (9th Cir.1983) ("plaintiff's speech was specifically and purposefully directed to the public

---

**2.** The Complaint recited several specific instances of asserted corruption or wrongdoing at the Terminal Island prison, reported by Mr. Fiorillo to the authorities, and his ensuing asserted punishment or harassment, for which Mr. Fiorillo sought actual and compensatory damages.

**3.** The government's brief states at page 12 that Mr. Fiorillo "granted press interviews with re-

porters for two local newspapers.[10]" Footnote 10 to the government's brief reads: "Four other newspapers contained similar articles, although there is no indication that Mr. Fiorillo spoke to reporters for these other newspapers."

It was not asserted that Mr. Fiorillo initiated the press contacts for which he was punished.

both through city council meetings and a television interview"); *Acanfora v. Board of Education of Montgomery County*, 491 F.2d 498, 500–01 (4th Cir.), *cert. denied*, 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63 (1974); *Pilkington v. Bevilacqua*, 439 F.Supp. 465, 475 (D.R.I.1977), *aff'd*, 590 F.2d 386 (1st Cir.1979).

The extensive newspaper interest supports no other conclusion but that Mr. Fiorillo's expression dealt with matters of public interest and public concern. The subjects reported by the press are as much of public interest or concern as the allocation of school funds, *Pickering, supra;* the structure of a state university system, *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); the establishment of a faculty dress code, *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); discriminatory school employment policies, *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); and political pressures on assistant district attorneys to work on political campaigns, *Connick, supra.*

Contrary to the statement in the majority opinion, the Court in *Connick* imposed no requirement that "the *primary* motivation of the employee must be the desire to inform the public on matters of public concern, and not personal vindictiveness." The test of protected speech is not one of subjective motivation. The test is objective: does the employee's speech reflect a matter of *general* concern, or solely matters of internal or personal interest such as office morale, salary levels, or duty assignments? In this objective test, it matters not at all whether personal vindictiveness is the motivation for speaking out.[4] It is the content of the speech, in the context in which it is expressed, that is important.

The newspaper accounts of Mr. Fiorillo's lawsuit informed the public about a series of abuses and corrupt practices at the Terminal Island facility, about two prison guards (Fiorillo and another) who revealed these incidents to prison officers and were assertedly reprimanded, harassed, and denied promotions, and who up to now had been afraid to "level the charges publicly" because of "further retribution". Mr. Fiorillo's remarks to the press repeated or rephrased allegations contained in his Complaint, and added nothing that would convert his public speech to unprotected private expression.

The newspapers do not report Mr. Fiorillo's personal health problems of hypertension and high blood pressure or his dissatisfaction with his assignment to an "inside" rather than "outside" post. These matters are not of public concern and, although the majority holds that they motivated Mr. Fiorillo's lawsuit (a holding for which there is no factual support in the record), the jurisprudence establishes that such motivation, if true, does not thereby override the constitutional and statutory safeguards of otherwise protected speech on matters of public concern. Unlike the employee in *Connick*, Mr. Fiorillo did "seek to inform the public that the [agency] was not discharging its governmental responsibilities" in the care and supervision of federal inmates, and did "seek to bring to light actual or potential wrongdoing or breach of public trust" on the part of prison officials and others. 461 U.S. at 148, 103 S.Ct. at 1691. Nor is this a situation where "a single employee is upset with the status quo". *Id.* The articles state that two guards had filed suit, and reflect a history of public concern about the prison.

Mr. Fiorillo's allegedly personal motivation for speaking to the press about his lawsuit that had just been filed can not invalidate the "public concern" status of this information. *"Connick* does not require every word of a communication to be of interest to the public." *Anderson v.*

---

4. The only reference to "personal vindictiveness" in the arbitrator's decision appears in the summary of the *government's* argument. The arbitrator made no finding of personal vindic-tiveness, and the record contains no evidentiary support for such a conclusion in the majority and concurring opinions.

*Central Point School District No. 6,* 746 F.2d 505, 507 (9th Cir.1984). Speech on a subject of public interest does not "lose its status as a communication protected by the first amendment merely because it contains some details". *Id.* Nor can it "be considered to have been dominated by the co-existing private concern, i.e. [the employee's] retention of his employment". *O'Brien,* 748 F.2d at 407–08.

It is significant that the Terminal Island facility already had become an issue of public concern, based on entirely separate complaints by prison inmates alleging that prison employees had extorted money and smuggled drugs, and numerous resultant resignations and dismissals of prison employees. *See O'Brien,* 748 F.2d at 407 ("subject matter of [employee's] communications, i.e., his perception of potential graft and corruption, is deserving of vigilant protection by the First Amendment"); *Brockell,* 732 F.2d at 668 (employee's speech is granted greater protection when he acts as a whistle-blower exposing government corruption); *Atcherson v. Siebenmann,* 605 F.2d 1058, 1063 (8th Cir. 1979) ("allegations of missappropriation of public funds by her coworkers represent a matter of compelling public concern"); *Choudhry v. Jenkins,* 559 F.2d 1085, 1089 (7th Cir.), *cert. denied sub nom. Indiana v. Choudhry,* 434 U.S. 997, 98 S.Ct. 634, 54 L.Ed.2d 491 (1977) ("the public interest also encompasses concern for remarks which disclose prison security so abysmal as to put the public in jeopardy"). Federal criminal indictments against several prison officials and guards had already been issued. In this context the public interest in Mr. Fiorillo's suit is apparent, as is the reason for media interest. It was yet another revelation concerning corruption at a known "problem prison".

The majority's "primary motivation" test is erroneous for yet another reason. The Supreme Court has never held that employee speech must be primarily or predominately of public concern before it is protected, as long as some aspects are of public concern. In *Connick* an assistant district attorney was fired for distributing a four-

teen-part questionnaire in the office. The Court found that thirteen of the questions related to issues such as office transfer policy, office morale, the need for a grievance committee, and the level of confidence in supervisors, all of which the Court considered to be matters of personal interest. However, one question out of the fourteen related to whether employees felt pressured to work in political campaigns. The Court therefore held that the employee's speech touched on a matter of public concern, and that the *Pickering* balancing test had to be applied to determine whether the speech was protected. 461 U.S. at 149, 103 S.Ct. at 1691.

In Mr. Fiorillo's Complaint and comments thereon to the press, he did indeed mention the personal reprisals he had suffered. But it was the asserted reasons for these reprisals—the events showing mismanagement and corruption at the prison that Mr. Fiorillo reported and attempted to redress—that were the cause of both the press/public interest and the reprisals against Mr. Fiorillo. Whatever motivated Mr. Fiorillo to blow the whistle, to file a lawsuit, and to answer press questions about his lawsuit, the public interest in the entire affair is vivid. In this context, Mr. Fiorillo's conversations with the press—the basis on which he was suspended and demoted—are protectable First Amendment expressions. To squelch such conversations is contrary to our nation's most fundamental traditions, bottomed on the basic right of citizens to criticize their government.

Thus I do not agree with the majority opinion that Mr. Fiorillo's "'news' was stale". Six newspapers did not consider it stale. Further, the newspapers reported the news that Mr. Fiorillo had filed his suit the day before. As the newspaper articles show, corruption within the Terminal Island facility was of current public concern in view of the pending indictments against its prison officials and employees. The filing of Mr. Fiorillo's lawsuit was "news", and there is no evidence that the information reported had theretofore been publicly

revealed. The press interest speaks for itself.

Nor is the First Amendment limited to current events, as implied by the majority. Protected speech does not have a limited life. As the Supreme Court said: "No suggestion can be found in the Constitution that the freedom there guaranteed for speech and the press bears an inverse ratio to the timeliness and importance of the ideas seeking expression." *Time, Inc. v. Hill*, 385 U.S. 374, 388, 87 S.Ct. 534, 542, 17 L.Ed.2d 456 (1967), quoting *Bridges v. California*, 314 U.S. 252, 269, 62 S.Ct. 190, 196, 86 L.Ed. 192 (1941). *See also Pennekamp v. Florida*, 328 U.S. 331, 346 n. 12, 66 S.Ct. 1029, 1037 n. 12, 90 L.Ed. 1295 (1946).

### B.

Having determined that Mr. Fiorillo's statements to the press were on matters of public concern, *Pickering* requires first an analysis of the truth or falsity of the statements. The agency does not contest before us that the incidents disclosed by Mr. Fiorillo occurred, or that he had been reprimanded or suspended in the past for bringing such incidents to the attention of the authorities. The agency's main argument appears to be directed to Mr. Fiorillo's statement to the press that his "promotion will never happen, basically because of what I have brought to their attention". The record is unclear as to whether Mr. Fiorillo established before the arbitrator that he knew the truthfulness of this statement, although it is apparent that his promotion did not "happen", because it is his suspension and demotion that were before the arbitrator on appeal. The arbitrator made no finding that Mr. Fiorillo's statements were either intentionally false or made with a reckless disregard for the truth, and the record contains no evidence purporting to prove that fact. Without proof of malicious or reckless intent, statements that otherwise meet First Amendment criteria are protectable even if they ultimately are found to be false:

> [T]o say an employee reporting what he believes is going on is guilty of miscon-

duct if he cannot prove it, is tantamount to saying he is not to transmit anything at all. Any regulation which would compel the critic of official conduct to guarantee the truth of all his factual assertions—and to do so on pain of dismissal from his job—leads to "self-censorship," a result which cannot be tolerated in this area.

*Swaaley v. United States*, 376 F.2d 857, 861–62, 180 Ct.Cl. 1, 9 (1967) (citation omitted). *See also Brasslett*, 761 F.2d at 841.

*Pickering* next requires evaluation of the government's legitimate interest in repressing the employee's speech. The agency contends that Mr. Fiorillo "denigrated the efforts of the Agency; undermined public confidence in the Agency; damaged employee morale; and harmed the working relationship among Correctional Officers". The record, however, is devoid of any affidavit or documentary evidence tending to prove that Mr. Fiorillo's speech had an actual or potential effect of serious disruption within the agency. *See Tygrett*, 627 F.2d at 1285; *Bickel*, 632 F.2d at 1257; *Atcherson*, 605 F.2d at 1063; *Begg*, 555 F.Supp. at 1352.

The majority correctly notes that *Connick* does not require actual disruption, but only that harm be "reasonably apprehensible". However, *Connick* dealt with a position at a high level of personal trust and confidence, and specifically "caution[ed] that a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern" than existed in that case. 461 U.S. at 152, 103 S.Ct. at 1692–93. In a situation lacking such a close working relationship and involving matters of greater public concern, the Court rejected the notion that public disclosures are *per se* harmful, and required that actual harm be demonstrated by evidence at the hearing below. *Pickering*, 391 U.S. at 570–71, 88 S.Ct. at 1735–36.

The arbitrator found that Mr. Fiorillo was a correctional officer who "works independently with only minimal supervision". There was no evidence that he enjoyed a

confidential or "close working relationship" with the warden, the assistant counsel for the Bureau of Prisons, or other high level prison officials who were the brunt of Mr. Fiorillo's criticism. *Compare Connick,* 461 U.S. at 151–52, 103 S.Ct. at 1692 (close working relationship between District Attorney and Assistant District Attorney) with *Pickering,* 391 U.S. at 569–70, 88 S.Ct. at 1735 (no close working relationship between teacher and Board of Education). *See also Brasslett,* 761 F.2d at 845–46; *McKinley,* 705 F.2d at 1115; *Pilkington,* 590 F.2d at 388. The government's claim of office disruption and damaged working relationships was further belied by the fact that it did not fire Mr. Fiorillo but only suspended and demoted him. *See Porter,* 592 F.2d at 780 ("Since the agency decision to suspend and thus silence [the employee] was made after she had spoken fully ... the suspension did not meaningfully reduce [her] allegedly 'disruptive' influence").

The arbitrator specifically found that "[t]here was no evidence adduced to support the charge that the grievant was unwilling or failed to acceptably perform his job". As in *Connick* there was no demonstration that Mr. Fiorillo's newspaper interviews "impeded [his] ability to perform [his] responsibilities" as a correctional officer at the Terminal Island facility. 461 U.S. at 151, 103 S.Ct. at 1692. *See also Nathanson v. United States,* 630 F.2d 1260, 1263–64 (8th Cir.1980); *Porter,* 592 F.2d at 780; *Pilkington,* 590 F.2d at 387–88.

The potential for substantial disruption at the Terminal Island prison must be viewed in light of the on-going investigations and pending criminal indictments. The public's confidence in the integrity of the Terminal Island facility had already been shaken. *See Hanneman v. Breier,* 528 F.2d 750, 754 (7th Cir.1976) ("By the time plaintiffs' letter appeared, the ability of the chief of police to conduct his internal investigation in private had already been destroyed by publication of a front-page newspaper article disclosing the existence of the investigation and the persons and subjects involved."); *Ruhlman v. Hankin-*

*son,* 461 F.Supp. 145, 149 (W.D.Pa.1978), *aff'd,* 605 F.2d 1195 (3d Cir.1979), *cert. denied,* 445 U.S. 911, 100 S.Ct. 1090, 63 L.Ed.2d 327 (1980) (disruption already precipitated by quota system rather than plaintiff's speech on the subject).

The arbitrator found that the press releases on their face "resulted in substantial damage to the working relationship between him and his superiors"—and indeed the adverse action taken against Mr. Fiorillo shows a damaged working relationship. But it is precisely this punishment of protected activity that the law prohibits. It is anomalous to hold that because an employee's superiors may punish him for speaking out, the law will not allow him to speak out. As observed by the Fifth Circuit in *Porter v. Califano:*

> The First Amendment balancing test can hardly be *controlled* by a finding that disruption did occur. An employee who accurately exposes rampant corruption in [his] office no doubt may disrupt and demoralize much of the office. But it would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office.

592 F.2d at 773–74 (emphasis in original). *See also Brockell,* 732 F.2d at 668; *Atcherson,* 605 F.2d at 1063.

Prison employees such as Mr. Fiorillo are in the best, if not the only, position to know of internal prison problems of public concern. "It is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." *Pickering,* 391 U.S. at 572, 88 S.Ct. at 1736. *See O'Brien,* 748 F.2d at 406–07 ("a policeman's rights must be vigilantly protected because he or she is 'extraordinarily able to inform the public of deficiencies in this important governmental department'"); *Atcherson,* 605 F.2d at 1063 (plaintiff "may have been the only person aware of the evidence that her coemployees padded their mileage claims" and therefore "must be

protected from the threat of retaliatory discharge").

On the facts before us, it is clear that the government's interest in preserving an untainted external image (see Program Statement 3420.5) is no match for the crucial public concern in the integrity of the prison system. As Mr. Fiorillo's protected speech was the motivating cause of his suspension and demotion, *see Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 578, the adverse action can not be sustained.

### C.

Mr. Fiorillo's disclosures are protected not only by the Constitution, but expressly by the Civil Service Reform Act of 1978. Pursuant to 5 U.S.C. § 2302(b), Congress has made it a "prohibited personnel practice" for government officials to:

(8) take or fail to take a personnel action with respect to any employee ... as a reprisal for—

(A) a disclosure of information by an employee ... which the employee ... reasonably believes evidences—

(i) a violation of any law, rule, or regulation, or

(ii) mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety,

if such disclosure is not specifically prohibited by law....

\*    \*    \*    \*    \*    \*

(11) take or fail to take any other personnel action if the taking of or failure to take such action violates any law, rule, or regulation implementing, or directly concerning, the merit system principles contained in section 2301 of this title.

The relevant merit system principles under 5 U.S.C. § 2301(b) include:

(2) All employees ... should receive fair and equitable treatment in all aspects of personnel management ... with proper regard for their ... constitutional rights.

\*    \*    \*    \*    \*    \*

(9) Employees should be protected against reprisal for the lawful disclosure of information which the employees reasonably believe evidences—

(A) a violation of any law, rule or regulation, or

(B) mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety.

Under relevant canons of the Code of Ethics for Government Service, which are required to be displayed in all agencies:

Any person in Government service should:

I. Put loyalty to the highest moral principles and to country above loyalty to persons, party, or Government department.

II. Uphold the Constitution, laws, and regulations of the United States and of all governments therein and never be a party to their evasion.

\*    \*    \*    \*    \*    \*

IX. Expose corruption whenever discovered.

Pub.L. No. 96–303, 94 Stat. 855 (1980), reproduced as a note to 5 U.S.C. § 7301.

In enacting the Civil Service Reform Act of 1978, Pub.L. 95–454, 92 Stat. 1121 (CSRA), Congress stated its intent to provide "new protections for employees who disclose illegal or improper Government conduct". S.Rep. No. 969, 95th Cong., 2d Sess. 2, *reprinted in* 1978 U.S.Code Cong. & Ad.News 2723, 2724 ("Senate Report"). The legislative history makes clear that the CSRA

gives the Merit Systems Protection Board and the Special Counsel explicit authority to protect whistle blowers— Federal employees who disclose illegal or improper government activities. Often, the whistle blower's reward for dedication to the highest moral principles is harassment and abuse. Whistle blowers frequently encounter severe damage to their careers and substantial economic loss.

Protecting employees who disclose government illegality, waste, and corruption is a major step toward a more effective civil service. In the vast Federal bureaucracy it is not difficult to conceal wrongdoing provided that no one summons the courage to disclose the truth. Whenever misdeeds take place in a Federal agency, there are employees who know that it has occurred, and who are outraged by it. What is needed is a means to assure them that they will not suffer if they help uncover and correct administrative abuses. What is needed is a means to protect the Pentagon employee who discloses billions of dollars in cost overruns, the GSA employee who discloses widespread fraud, and the nuclear engineer who questions the safety of certain nuclear plants. These conscientious civil servants deserve statutory protection rather than bureaucratic harassment and intimidation.

*Id.* at 8, 1978 U.S.Code Cong. & Ad.News at 2730.

The Senate Report is explicit that a government "employee is ... to be protected against any infringement of ... constitutional rights." *Id.* at 19, 1978 U.S.Code Cong. & Ad.News at 2741. Furthermore, the limitation of protection in 5 U.S.C. § 2302(b)(8)(A) to disclosures "not prohibited by law" was narrowed by the Senate from the House proposed language "not prohibited by law, rule, or regulation", as that broader language "would encourage the adoption of internal procedural regulations against disclosure, and thereby enable an agency to discourage an employee from coming forward with allegations of wrongdoing". *Id.* at 21, 1978 U.S.Code Cong. & Ad.News at 2743. The Conference Committee adopted the Senate approach, stating:

The reference to disclosures specifically prohibited by law is meant to refer to statutory law and court interpretations of those statutes. It does not refer to agency rules and regulations.

H.R.Conf.Rep. No. 1717, 95th Cong., 2d Sess. 130, *reprinted in* 1978 U.S.Code Cong. & Ad.News 2860, 2864.

Pursuant to 5 U.S.C. § 2302(b)(8)(A), Mr. Fiorillo had the burden of showing that (1) he made a protected disclosure; (2) the agency proposing the adverse action knew of the disclosure; (3) retaliation resulted; and (4) there was a nexus between the retaliation and the adverse action. *Sullivan v. Department of the Navy,* 720 F.2d 1266, 1275 (Fed.Cir.1983). *See also Hagmeyer v. Department of the Treasury,* 757 F.2d 1281, 1284 (Fed.Cir.1985). As has been discussed, the case before us embodies all of the elements of a classical whistleblowing situation, and the notice of proposed adverse action itself states that Mr. Fiorillo was being acted against because of his public disclosures.

The arbitrator held that Mr. Fiorillo cannot be protected by the whistleblower statute because his "primary motive" for making his statement was for personal reasons, referring to the definition of whistleblower in the Special Counsel's Office regulation in 5 C.F.R. § 1250.3(c). This regulation does not, however, state the "primary motivation" test criticized in subpart *A.* above. The arbitrator, and the government on this appeal, mis-state or mis-interpret this regulation, which follows the statutory language in 5 U.S.C. § 2302(b)(8), and states in relevant part:

Where the information disclosed affects only the personnel situation of the complainant, it will normally be treated as an allegation of a prohibited personnel practice or violation of other civil service law, rule or regulation, and the complainant will not be considered to be a whistleblower.

The regulation relates to the subject matter of the disclosure, not the reason or motivation for the disclosure; that is, where the subject matter affects *only* the complainant's situation, it is normally not a matter of whistleblowing.

The information disclosed by Mr. Fiorillo exposed many aspects of prison corruption, mismanagement, and abuse, and also re-

ferred to those aspects of his personnel situation that related to retaliation. Retaliation for exposing prison corruption is a prohibited personnel practice in violation of 5 U.S.C. § 2302(b)(8). It can not be sustained. 5 U.S.C. § 7701(c)(2)(B).

### D.

The decision of the majority will have a chilling effect on any employee who seeks to exercise his or her constitutional right, and moral obligation, to speak out on issues of public concern that relate to the government employer, for according to the court's decision today such speech is not protected if the employee can be shown to have any personal motivation for speaking, contrary to the holdings in *Connick* and *Pickering.*

### APPENDIX A

Los Angeles Times, Wednesday, April 27, 1983, Part II, pages 1, 6, headline "Terminal Island Whistle Blower Files Suit/Guard Claims Harassment for Revealing Corruption at Prison", byline Dan Morain:

A Terminal Island prison guard filed suit Tuesday charging that he was denied promotions for blowing the whistle on other prison guards and officials who assertedly gave convicted Polish spy Marian Zacharski unlimited access to phones and ignored a coded letter that Christopher Boyce, convicted of spying for the Soviet Union, tried to mail to Tahiti.

"My promotion will never happen, basically because of what I have brought to their attention," said Francis M. Fiorillo, a guard for 13 years.

He is one of two guards who sued the U.S. Bureau of Prisons and several Terminal Island prison officials Tuesday, charging that they have been harassed and threatened for whistle-blowing.

Fiorillo, who is seeking $65 million in damages, said in his U.S. District Court suit that prison officials were uninterested in a letter by Boyce he intercepted in 1977. At the time, the former Palos Verdes man was being tried on charges that he sold classified information to Soviet agents.

The letter to an address in Tahiti contained phone numbers, initials and "other coded information." When Fiorillo persisted by calling the FBI about it, he was reprimanded for "conducting an unauthorized investigation," he said in an interview.

He said the same thing happened when he told the FBI that Boyce's partner, Andrew Dalton Lee, had made up his mind to talk to federal agents about his spying shortly before he was to be sentenced in 1977.

More recently, he said, he was reprimanded after he reported that Zacharski had "virtually unlimited access to the telephone" at Terminal Island. The Polish national, who like Boyce and Lee has since been transferred from Terminal Island, was convicted in 1981 of buying secrets from a Hughes Aircraft Co. employee.

Fiorillo, 53, said he also was reprimanded after he told Robert B. Lyon Jr., an assistant counsel for the Bureau of Prisons, in 1980 that a woman inmate was allowed to get an abortion under an assumed name at Harbor General Hospital in Torrance. A prison employee had gotten her pregnant, Fiorillo said. The prison once housed women but no longer does.

On another occasion, Fiorillo said, he told a Terminal Island prison captain that an inmate had reported seeing a prison employee rape a woman inmate, but that prison officials refused to investigate.

For the last year, the U.S. attorney's office has been probing corruption at the Federal Correctional Institution at Terminal Island, including allegations that prison employees extorted money from inmates, smuggled in drugs and took bribes from prisoners in return for giving them favored treatment. Three prison officials have been indicted so far. At least 10 others are under investigation.

Assistant U.S. Atty. Joyce Karlin, who heads the criminal investigation, said charges by Fiorillo and fellow guard Alfred

N. Willrich, who also sued Tuesday, are not relevant to the investigation.

Neither Fiorillo nor Willrich has been called to testify before a federal grand jury looking into the charges of official corruption, their lawyer, Jeffrey Schwartz, said.

Willrich, a prison employee for 12 years, charged in his suit that he was demoted from garage foreman to correction officer and given a $7,000–a-year pay cut after he relayed complaints from inmates about abuse by prison guards. He could not be reached for comment.

Jack Bean, executive assistant to the Terminal Island warden, refused to comment on the suits.

Although the two guards were willing to tell their bosses about internal problems, they did not level the charges publicly before now because they were afraid of further retribution, the suits said.

"It's easy to be set up," said Schwartz, who also represents Joe Seide, a former Terminal Island inmate who initiated the U.S. attorney's investigation by complaining that guards tried to extort money from him.

In his suit, Fiorillo said a prison official, who was not identified, got an inmate to try to plant cocaine on him. In the interview, he said there was another attempt to plant marijuana on him.

## APPENDIX B

Los Angeles-Herald Examiner, Wednesday, April 27, 1983, page A 10, headline "Terminal Island Guards Sue Over Corruption", byline Gordon Dillow:

Two guards at the Terminal Island federal prison have filed suit against their bosses in federal court, alleging widespread corruption and malfeasance by prison guards and administrators.

Among other things, the guards charge there were sexual attacks on female inmates—at least one allegedly involving a prison employee—and "breaches of national security" by convicted spies imprisoned at Terminal Island.

When the problems were brought to the attention of prison administrators, the suits allege, they were ignored and the corrections officers who reported the problems were subjected to "harassment."

The charges were leveled yesterday in two suits filed in Los Angeles federal court by Jeffrey Schwartz, an attorney for corrections officers Francis M. Fiorillo and Alfred N. Willrich. Schwartz also represents Joseph Seide, a former Terminal Island inmate whose complaints against prison guards and officials prompted a federal investigation of the prison that resulted in numerous resignations and firings of employees. The probe also was followed by at least one criminal indictment of a former Terminal Island guard on charges that he sold drugs to inmates and helped two prisoners escape.

Named as defendants in the suit are the U.S. Bureau of Prisons and a number of officials, including Terminal Island warden Jerry Williford.

In a telephone interview yesterday, Fiorillo, 53, a 13–year employee at Terminal Island who is now on sick leave, said he believes that despite the recent investigation and indictment, the prison is still "saturated with corruption."

Fiorillo said his problems began in 1977, when an inmate reported the rape or attempted rape of a female inmate—females are no longer incarcerated at Terminal Island—by a prison employee. Fiorillo said he filed a report on the incident and was reprimanded and suspended for two weeks.

Willrich also alleged in his lawsuit that corruption is "rampant" at the prison. Fiorillo and Willrich are seeking punitive damages ranging from $25 million to $65 million.