Dwayne T. MINGS, Petitioner,

v.

**DEPARTMENT OF JUSTICE,**
Respondent.

**Appeal No. 86–1277.**

United States Court of Appeals,
Federal Circuit.

March 5, 1987.

Thomas J. Griffith, Lubbock, Tex., argued, for petitioner. With him on the brief was George E. Gilkerson, Lubbock, Tex.

Tamra Phipps, of the Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued, for respondent. With her on the brief were Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, and Robert A. Reutershan, Asst. Director, Commercial Litigation Branch, Dept. of Justice, Washington, D.C.

Before FRIEDMAN, Circuit Judge, BALDWIN, Senior Circuit Judge, and ARCHER, Circuit Judge.

FRIEDMAN, Circuit Judge.

The petitioner challenges a decision of the Merit Systems Protection Board (Board) sustaining his removal from the Immigration and Naturalization Service of

the Department of Justice (agency), on the grounds that the petitioner (1) used insulting and abusive language concerning agency employees and others in a letter to an agency official, and (2) made an implied threat to change his testimony in a suit against the agency unless the agency hired his son, 30 M.S.P.R. 424. We affirm.

I

The petitioner was employed as a border patrol agent in Lubbock, Texas. Effective May 17, 1985, he was removed from his position, based on four charges. After a hearing, the presiding official of the Board sustained two of these charges and affirmed the removal. The full Board refused to review that decision.

The first sustained charge involved the petitioner's use of insulting and abusive language toward agency employees and others in a letter, dated November 16, 1984, that the petitioner wrote on official stationery to James H. Smith, who was then an assistant district director for investigations. The letter strongly criticized the agency's form I–293, which the border patrol used nationwide to notify aliens of hearings, hearing dates, and hearing locations. The letter first asserted that "[t]he I–293 is the poorest example of an official document, and could only have been designed by those desiring to further the give-away [sic] of the U.S. to hispanics." The letter then stated:

All the I–293 accomplishes is to give an illegal alien more time to become further entrenched and hinder the Service efforts in removing him. So why are investigators and border patrol agents passing out I–293 forms? I'll tell you why—those officers are either Catholic, and have not studied the history of those countries that are predominently Catholic (all of them are corrupt, backward, beggarly countries) or they are too damned incompetent to break the aliens off their lies, and too damned lazy to process the aliens!

If someone's feelings get hurt, tough! My country is worth more than some Catholic's pride. The truth is—I have to smuggle the illegal aliens by my own Catholic Chiefs, District Directors, etc., etc. in order to get them out of the United States.

. . . .

There are many persons in this service who need to be challenged where their loyalty lies; with the United States?? (Grammar, punctuation and spelling are as in original.)

The Board found that the petitioner's letter contained insulting and abusive language disparaging Catholics, Hispanics and agency employees, and that the agency could reasonably apprehend that the petitioner's attitude would adversely affect his ability to act impartially in performing his duties as a law enforcement agent. The Board ruled that the first amendment did not bar disciplinary action against the petitioner based upon the letter, since the letter related only "peripherally to a matter of public concern," and was likely to have a seriously disruptive impact on agency operations.

The second sustained charge was that the petitioner made an implied threat to change his testimony in a pending case to coerce the agency to hire the petitioner's son. This charge was based on a conversation that the petitioner had with Michael Creppy, a Department of Justice attorney who represented the agency in the trial of *Ortega v. Rowe*. *Ortega* was a class action suit against the agency brought by aliens who alleged that local jails in which they were confined were unsafe and unsanitary. The petitioner met with Mr. Creppy on September 29, 1984. At this time, the petitioner had already testified as a witness for the government in the *Ortega* case, but there was a possibility that he would later be called as a witness for the plaintiffs.

According to the presiding official, Mr. Creppy testified at the Board hearing that during his conversation with the petitioner, the petitioner informed him that his son had recently failed the oral portion of the border patrol examination and attempted to show Mr. Creppy a folder of jobs with the agency that the petitioner's son had applied for and had not received. Mr. Creppy fur-

ther testified that the petitioner "stated that he was going to let the judge know the true conditions of the jail."

The petitioner gave a different version of his conversation with Mr. Creppy. According to the petitioner, he made contact with Mr. Creppy in order to inform Mr. Creppy that he believed that his earlier testimony in the *Ortega* case had been viewed as unfavorable to the government, and that the agency had refused to hire his son in retaliation for this testimony. The petitioner denied threatening to alter his testimony in the *Ortega* case.

In sustaining the charge that the petitioner had used an implied threat in an attempt to coerce a government official, the presiding official found Mr. Creppy to be a "credible" witness who testified in a "direct and forthright manner," but that the petitioner's testimony was implausible and inconsistent.

## II

The petitioner challenges the Board's decision sustaining his removal on three grounds. First, he contends that his May 16, 1984 letter to the assistant director of the agency was protected by the first amendment and could not be a basis for his removal. Second, he argues that substantial evidence does not support the Board's finding that he made an implied threat to change his testimony in an effort to secure employment for his son. Finally, the petitioner claims that the agency failed to establish a causal nexus between his removal and the efficiency of the service, and that the penalty imposed was grossly disproportionate to the misconduct involved.

A. *First Amendment Protection.* On several occasions the Supreme Court has considered the scope of the first amendment protection applicable to speech by public employees. *See, e.g., Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Al-

though the Court has recognized that a public employee has a constitutionally protected interest in freedom of expression, *see Connick,* 461 U.S. at 142, 103 S.Ct. at 1687, the Court has ruled that in determining the measure of that right, the employee's interest must be balanced against the need of government officials for "wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Id.* at 146, 103 S.Ct. at 1690. Accordingly, the determination of the free speech rights of government employees involves:

> a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734. *Accord Connick,* 461 U.S. at 142, 103 S.Ct. at 1687; *Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 414, 99 S.Ct. 693, 695, 58 L.Ed.2d 619 (1979); *Mount Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 284, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977).

■ Applying the Supreme Court's balancing test requires a two-part analysis. It is necessary to determine (1) whether an employee's statement addressed a matter of public concern and, if so, (2) whether the interest of the governmental agency in promoting the service it performs outweighs the employee's interest as a citizen. *Brown v. Department of Transp., FAA,* 735 F.2d 543, 546 (Fed.Cir.1984).

■ 1. *Matter of Public Concern.* The petitioner wrote a letter to an agency director, on agency stationery, in which he criticized the agency's nationwide use of form I–293 to notify aliens of their hearing rights. The petitioner did not confine his comments to the alleged deficiencies of the form, however, but instead used the letter as a vehicle for a personal diatribe against Hispanics, Catholics, and the competency of the agency's border patrol.

The first amendment "does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Connick,* 461 U.S. at 149, 103 S.Ct. at 1691. Accordingly, where speech involves only internal agency grievances rather than matters of "political, social, or other concern to the community," the speech does not involve matters of public concern. *Id.* at 146, 103 S.Ct. at 1690 (speech did not involve matter of public concern where employee distributed a questionnaire to other employees regarding agency transfer procedures); *see also Fiorillo v. Department of Justice,* 795 F.2d 1544, 1550 (Fed.Cir.1986) (speech did not involve matter of public concern where prison guard released damaging statements about prison to the press); *Roseman v. Indiana Univ.,* 520 F.2d 1364, 1367–68 (3d Cir.1975), *cert. denied,* 421 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 329 (1976) (speech did not involve matter of public concern where university faculty member made critical remarks regarding the chairman of her department).

We agree with the Board that under this standard the petitioner's letter touched only tangentially, if at all, on matters of public concern. The letter did not discuss the general problem of the rights of illegal aliens, but merely criticized the form the agency used to notify aliens of their hearing rights. Like the questionnaire regarding office management that the assistant district attorney distributed in *Connick* and the statements that the prison guard made regarding prison policies in *Fiorillo,* the petitioner's personal dissatisfaction with and attack upon form I–293 is more appropriately classified as an internal agency grievance than a matter of public interest.

■ The fact that the petitioner's letter was directed to an agency official rather than to the public at large would not preclude a finding that the letter addressed a matter of public concern. *See Givhan,* 439 U.S. at 413, 99 S.Ct. at 695. The petitioner's use of internal agency channels to vent his dissatisfaction with a specific agency form, however, buttresses the conclusion that the letter did not address a matter of general public interest. Since the petitioner's letter related to an internal agency grievance rather than a "'matter of legitimate public concern' upon which 'free and open debate is vital to informed decision-making by the electorate,'" *Connick,* 461 U.S. at 145, 103 S.Ct. at 1689 (quoting *Pickering,* 391 U.S. at 571–72, 88 S.Ct. at 1736), the agency properly relied on the letter as a basis for the petitioner's removal.

■ Moreover, in determining whether the letter addressed a matter of public concern, the entire document must be considered. *See id.* 461 U.S. at 147–48, 103 S.Ct. at 1690; *see also Fiorillo,* 795 F.2d at 1550 ("It is the nature of the whole communication that must be reviewed to determine whether it is a matter of 'public concern.'"). Viewed as a whole, the letter was not merely a sharp criticism of form I–293, but also expressed the petitioner's racial and religious prejudice. The petitioner's attitude toward Catholics and Hispanics reflected his personal views rather than a matter of general public concern. *Cf. Fiorillo,* 795 F.2d at 1550 (prison guard released damaging statements about prison for personal reasons rather than out of a desire to inform the public).

Where an "employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest," a federal court may not, "absent the most unusual circumstances ... review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690. No such "most unusual circumstances" exist in this case.

■ 2. *Balance of Interests.* Even assuming *arguendo* that the petitioner's letter did address a matter of public concern, the agency would be precluded from relying upon the letter as a basis for removal only if the petitioner's free speech interest outweighed the interest of the agency in promoting the efficiency of the public service it performs. *Brown,* 735 F.2d at 546; *see also Connick,* 461 U.S. at

140, 150, 103 S.Ct. at 1686, 1691. Although in certain first amendment cases "particularized balancing [of competing interests] is difficult," *Connick*, 461 U.S. at 150, 103 S.Ct. at 1692, in the present case the potentially disruptive effect that the letter could have on agency operations substantially outweighed whatever public interest the letter addressed.

The letter reflected virulent anti-Hispanic and anti-Catholic bias and accused the petitioner's superiors and fellow employees of incompetence. Approximately half of the border agents with whom the petitioner worked were Hispanic. Many of the agency's employees were Catholic. In that situation, the continued presence of an employee who had expressed a hostile attitude toward a large number of his coworkers and toward his supervisors would be likely to have a disruptive effect upon the operation of the agency, as the agency itself feared.

Moreover, since 98 percent of the aliens apprehended in the area where the petitioner worked were Hispanic, the petitioner's strong bias against that nationality raised a serious question concerning the petitioner's ability to perform his duties as a border patrol agent in a fair and unbiased manner. A law enforcement officer who has this attitude toward the persons he is charged with apprehending is likely to show little respect for their rights.

The petitioner contends, however, that the agency's mere apprehension that his continued employment would create disruption of and impede its operation is insufficient to justify his removal on the basis of the letter. According to the petitioner, the agency must show that its efficiency was actually diminished. The Supreme Court has rejected this contention. *See Connick*, 461 U.S. at 151–52, 103 S.Ct. at 1692 (sustaining dismissal of employee even where there was no demonstration that the employee's ability to perform her job was actually diminished). An employer has no obligation "to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Id.* at 152,

103 S.Ct. at 1692; *see also Fiorillo*, 795 F.2d at 1551 (potential of harm from the employee's speech need only be "reasonably apprehensible"). *Cf. Monsanto v. Quinn*, 674 F.2d 990, 999 (3d Cir.1982) (stronger showing of harm required where employee's speech touched on matters of substantial public importance).

■ *B. Implied Threat to Change Testimony.* The Board also found that the petitioner made an implied threat to change his testimony in a pending case in an effort to induce the agency to hire his son. As noted, *see supra* pp. 386–87, there was conflicting testimony about this incident. The Justice Department lawyer in charge of the case testified that the petitioner had made such an implied threat. The petitioner denied making the threat and gave a different version of the conversation.

The presiding official found the lawyer to be "an extremely credible witness," who "testified in a direct and forthright manner" and whose "testimony was consistent with prior written statements regarding the incident." He further found that, "[i]n contrast, [the petitioner's] testimony was not credible" and was "inconsistent." The presiding official therefore concluded that the lawyer's testimony was "more credible" than that of the petitioner. We have no basis upon which we properly could reverse that credibility determination. *DeSarno v. Department of Commerce*, 761 F.2d 657, 661 (Fed.Cir.1985); *see also Hambsch v. Department of the Treasury*, 796 F.2d 430, 436 (Fed.Cir.1986) (credibility determinations by presiding officials are "virtually unreviewable"). In view of that credibility determination, substantial evidence supports the Board's finding that the petitioner made an implied threat to change his testimony in an attempt to induce the agency to hire his son.

■ *C. Efficiency of the Service.* Under 5 U.S.C. § 7513 (1982), an employee may be removed only for such cause as will promote the efficiency of the service. This "nexus" limitation requires the agency to show by a preponderance of the evidence that the employee's misconduct is likely to have an adverse effect upon the agency's

functioning. *White v. United States Postal Serv.*, 768 F.2d 334, 335–36 (Fed.Cir. 1985); *Brown*, 735 F.2d at 547.

■ The Board's finding that the petitioner's removal would promote the efficiency of the service was a factual finding which we sustain because it is supported by substantial evidence. *See White*, 768 F.2d at 336. As discussed previously, *see supra* part II A, the petitioner's bias against and intolerance of Catholics and Hispanics and his critical attitude regarding his superiors and co-workers cast grave doubts on the petitioner's ability to discharge his duties as a border patrol in a fair and impartial manner.

Moreover, the petitioner's implied threat to Mr. Creppy impaired his credibility and his ability to function effectively as a border patrol agent. The record shows that border patrol agents are frequently required to testify in court proceedings concerning aliens. In view of the petitioner's threat to change his testimony on one occasion, his reliability as a witness in future cases has been seriously impaired.

■ D. *Validity of the Penalty of Removal.* The petitioner's final challenge concerns the validity of the penalty of removal. The petitioner had approximately eighteen years of prior service with the agency, and had received excellent performance ratings. In addition, many individuals with whom the petitioner had worked testified that they believed the petitioner to be an excellent representative of the border patrol. Moreover, although the agency originally brought four charges against the petitioner, the Board sustained only two of them. In light of these mitigating factors, the petitioner contends that the penalty of removal was grossly disproportionate to the misconduct found.

This court has held that it will not disturb a choice of penalty within the agency's discretion unless the severity of the agency's action appears totally unwarranted in light of all the factors. *DeWitt v. Department of the Navy*, 747 F.2d 1442, 1445 (Fed.Cir.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1759, 84 L.Ed.2d 822 (1985). There "exists a great reluctance on the part of the courts to become enmeshed in the disciplinary process and, accordingly, great deference is accorded to the sound discretion of the agency in such matters." *See Weston v. Department of Housing and Urban Dev.*, 724 F.2d 943, 949 (Fed. Cir.1983).

In reviewing the propriety of the agency's penalty of removal, the presiding official recognized that the petitioner had had a long tenure with the agency and that only two of the original charges against him were sustained. Nonetheless, the presiding official found that the petitioner was unfit to occupy his "unique position of trust" as a law enforcement agent in light of the fact that he had expressed bias toward Catholics and Hispanics and had threatened to change his testimony at trial. On the basis of our review, the sanction of removal "in light of the circumstances and a consideration of [the appropriate mitigating] factors does not bespeak a result which is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Id.* at 950.

## CONCLUSION

The decision of the Merit Systems Protection Board sustaining the petitioner's removal is affirmed.

AFFIRMED.