Minnie L. HENRY, Petitioner,

v.

DEPARTMENT OF the NAVY,
Respondent.

No. 90–3018.

United States Court of Appeals,
Federal Circuit.

May 10, 1990.

Minnie L. Henry, Kansas City, Mo., submitted pro se.

Jonathan M. Kronheim, Dept. of Justice, Washington, D.C., submitted for respondent.

Before NEWMAN, Circuit Judge, PLAGER, Circuit Judge, and SHARP, District Judge.*

ALLEN SHARP, District Judge.

## I.

This case is a review sought by the petitioner, Minnie L. Henry, of an adverse deci-

---

* The Honorable Allen Sharp, Chief Judge, United States District Court for the Northern District of Indiana, sitting by designation pursuant to 28 U.S.C. § 293(a).

sion of the Merit Systems Protection Board (Board), affirming the action of the United States Navy removing her from the position of Payroll Reconciliation Technician at the United States Marine Corps Finance Center.

The petitioner was employed as a Payroll Reconciliation Technician, GS–0503–05 at the United States Marine Corps Finance Center in Kansas City, Missouri. On November 4, 1987, the petitioner was given a letter of reprimand for disrespectful conduct and insubordinate behavior for refusing a work assignment and calling her supervisor, Colonel Mutter, a "white man's nigger."

On January 11, 1988, the petitioner wrote letters to four guest speakers who were scheduled to address a celebration in honor of Dr. Martin Luther King Jr.'s birthday. This celebration was sponsored by the Center and the General Services Administration. It was to be held at the Center. These letters stated that the petitioner was a long-time employee of the Center and a former member of the EEO Advisory Committee. The letters also stated that Colonel Mutter took on "the appearance of a racist" and the Colonel excluded gospel singing from the Martin Luther King birthday celebration. The petitioner further stated that Colonel Mutter had "taken on the appearance" of showing sympathy for bigots and racists in his comments published in the Plan of the Day on January 21, March 3 and March 9, 1987. The Plan of the Day is a publication for Center employees.

Henry was removed from her job on March 3, 1988 for her refusal to perform legitimately assigned work and for her false and unfounded accusations she made against Colonel Mutter, the union and others.

As a result of her removal, the petitioner filed an appeal with the Merit Systems Protection Board Office for the St. Louis region. Settlement negotiations ensued at the suggestion of the Administrative Law Judge (ALJ). The ALJ was present at these negotiations, but they were not successful. An attempt was made between the ALJ and the petitioner to arrange a hearing date.

On April 18, 1988, the petitioner wrote a letter to the chairman of the Board alleging that the ALJ had demonstrated bias during the settlement negotiations and with his discussions concerning a hearing date. The petitioner then declined a hearing and requested the chairman to review the case. A different ALJ was assigned to the case for administrative reasons. An order was issued on April 19, 1988, which stated that a settlement conference would be held and listed the advantages. The petitioner responded that the ALJ's order was unethical and again waived her right to a hearing. The ALJ then issued an additional order stating that the settlement order was a routine and neutral document and offered petitioner the opportunity for a hearing. The petitioner elected to proceed without a hearing and both parties submitted documentation and briefs.

The ALJ found that there was no basis in fact for the petitioner's charges that Colonel Mutter took on the appearance of a racist, citing *Mings v. Department of Justice*, 813 F.2d 384 (Fed.Cir.1987). The ALJ found that the letter did not constitute protected speech because it did not address a matter of public concern. The ALJ further determined that if a matter of public concern had been addressed, the agency's right to maintain employee discipline outweighed any free speech interest. The ALJ also found that the petitioner had not established an affirmative defense of harmful procedural error, discrimination, reprisal or disparate treatment, and found that the penalty of removal was reasonable.

The petitioner then filed a petition for review to the full Board. The Board declined to grant review to petitioner's allegations of harmful error, retaliation or race discrimination, finding that there was no "persuasive evidence of error". The Board did, however, reopen the case to review the allegations of bias and prejudice as against the administrative judges. After a full analysis of those allegations, the Board on May 9, 1989 affirmed the decision of the

ALJ, finding no merit to the charge of bias. 40 M.S.P.R. 482.

## II.

The standard of review of this court is found in 5 U.S.C. § 7703(c). This court may only reverse the Board when the findings or conclusions of the Board are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or unsupported by substantial evidence. The court must also examine whether the Board committed an error of law. *Weston v. H.U.D.*, 724 F.2d 943, 948 (Fed.Cir.1983). It is not for this court to reweigh the evidence before the Board.

## III.

The petitioner makes six allegations of error which she wishes this court to review. The first and most serious involves Amendment I of the Constitution of the United States.[1] The petitioner claims that her letter to the guest speakers was protected speech. The petitioner further claims that her letters were true. The ALJ credited the affidavit of the Deputy EEO Officer, Mario B. Diaz, who swore that it was the EEO Committee which decided not to include gospel singing at the King celebration, contrary to the request of Colonel Mutter who did in fact want gospel singing included in that program.

The Supreme Court of the United States has established a two-part test to determine whether the speech of a public employee is protected under the First Amendment. The court must determine whether the speech addresses a matter of public concern and if so, whether the government's interest in the effective and efficient fulfillment of its responsibilities outweighs the employee's right to speak. The most recent delineation of these dual concerns is reflected in *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). In that case, an employee in a county constable's office in Texas was discharged for remarking to a co-worker after hearing of an attempt on the life of President Ronald Reagan "if they go for him again, I hope they get him". The employee in question was a data entry employee and not a commissioned peace officer. While that case involved proceedings under 42 U.S.C. § 1983, its discussion of the delineations involved in free speech protections of public employees is certainly relevant here.

In the majority opinion, Justice Marshall stated:

It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutional protected interest in freedom of speech. *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972) (citations omitted). Even though McPherson was merely a probationary employee, and even if she could have been discharged for any reason or for no reason at all, she may nonetheless be entitled to reinstatement if she was discharged for exercising her constitutional right to freedom of expression. See *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 284–285, 97 S.Ct. 568, 574–575, 50 L.Ed.2d 471 (1977); (*Perry v. Sindermann, supra*, 407 U.S., at 597–598, 92 S.Ct., at 2697–2698 (citations omitted)).

The determination whether a public employer has properly discharged an employee for engaging in speech requires "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968) (citations omitted); *Connick v. Myers*, 461 U.S. 138, 140, 103 S.Ct. 1684, 1686, 75 L.Ed.2d 708 (1983) (citations omitted). This balancing is necessary in order to accommodate the dual role of the public employer as a provider of public services and as a

---

**1.** Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

government entity operating under the constraints of the First Amendment. On the one hand, public employers are *employers*, concerned with the efficient function of their operations; review of every personnel decision made by a public employer could, in the long run, hamper the performance of public functions. On the other hand, "the threat of dismissal from public employment is … a potent means of inhibiting speech." *Pickering*, 391 U.S., at 574, 88 S.Ct. at 1737 (citations omitted). Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech.

483 U.S. at 383–384, 107 S.Ct. at 2896.

After deciding that McPherson's statement addressed a matter of public concern, the Supreme Court majority held that the state bears a burden of justifying the discharge on legitimate grounds. The Court suggested that the total factual context of the statement be considered in this regard. Thus, *Rankin* held that since McPherson's duties were purely clerical and limited to the civil process function of the constable's office that there was no indication that she would ever be in a position to have any involvement with minimal law enforcement activities engaged in by that office.

Concurring, and providing the deciding vote, Justice Powell set the situation in a slightly more restrained light when he stated:

> If a statement is on a matter of public concern, as it was here, it will be an unusual case where the employer's legit-

imate interests will be so great as to justify punishing an employee for this type of private speech that routinely takes place at all levels in the workplace. The risk that a single, offhand comment directed to only one other worker will lower morale, disrupt the work force, or otherwise undermine the mission of the office borders on the fanciful.

483 U.S. at 393, 107 S.Ct. at 2901.

Significantly, in a footnote, Justice Powell further stated:

> I do not read the Court's opinion as extending the *Connick/Pickering* test, or otherwise making it more difficult for employers to discipline workers whose speech interferes with these goals.

483 U.S. at 393, 107 S.Ct. at 2901.

A few weeks before the Supreme Court decided *Rankin*, this court decided *Mings v. Department of Justice, supra. Rankin* in no way disturbs this court's decision in *Mings*. In *Mings*, Judge Friedman carefully and succinctly traversed the same ground covered by the Supreme Court's opinion in *Rankin*. In *Mings*, this court upheld the decision of the Board sustaining an employee's removal.[2] This court found that a letter like the one here only tangentially touched on matters of public concern.

It might be conceded for purposes of this decision that whether or not gospel singing was included on an officially government-sponsored celebration for the birthday of Dr. Martin Luther King Jr. could well be a matter of public concern.[3] However, the ALJ carefully and fully reviewed the petitioner's submissions and those of the Navy. The ALJ specifically rejected as incredible that Colonel Mutter's statements could be

**2.** In a case involving a state university tenured professor under 42 U.S.C. § 1983, this writer traversed much of this conceptual territory. *See Fong v. Purdue University,* 692 F.Supp. 930 (N.D.Ind.1988). *See also Fiorillo v. U.S. Dept. of Justice,* 795 F.2d 1544 (Fed.Cir.1986).

**3.** Given the current pull and tug in the jurisprudence between the Free Exercise and Establishment Clause of the first Amendment, the petitioner's insistence on gospel singing at a government-sponsored function on government premises might well raise difficult problems for her governmental employers. It is altogether possi-

ble that another employee might contest the singing of gospel music at such a governmentally-sponsored function as coming within the inhibitions of the Establishment Clause. In any event, there was a different set of constitutional concerns and values that might be considered in the contemporary scene in regard to that subject. All of this is to demonstrate that governmental managers must be sensitive to a wide array of rights and values in its personnel relations. For example, see *Weisman v. Lee,* 728 F.Supp. 68 (D.R.I.1990), and the authorities therein.

construed to appear as racist. These credibility determinations should not be disturbed in this review.

■ Conceding public interest to be part for the analysis, it must be determined whether there is a justifiable basis in fact and in law of the conduct of the employer with regard to this petitioner-employee and there is. It was found by the Board and the ALJ that the petitioner categorically refused to do legitimately assigned work and made patently false and unfounded accusations against Colonel Mutter, the union and others.

The *Rankin* case does not inhibit this governmental employer from disciplining this petitioner employee under the circumstances of this case. Certainly, the governmental agency is burdened to demonstrate a "nexus" between the petitioner's conduct and the taking of disciplinary action to promote the efficiency of the service. *See Brown v. Department of Transportation, FAA,* 735 F.2d 543, 548 (Fed.Cir.1984); *Hayes v. Department of Navy,* 727 F.2d 1535, 1539 (Fed.Cir.1984). In this case, that nexus has been clearly established.

### IV.

■ The petitioner also challenges the failure of the Board, St. Louis regional office, to send the case to the Office of Special Counsel for decision. This issue was not raised before the ALJ or the Board. Thus, this argument is not properly before this court. However, the regulations clearly establish that only the Board itself, or its regional office, may render decisions. *See* C.F.R. 1200.1(k); 5 C.F.R. Subpart B; and 5 C.F.R. Subpart D. The function of the Office of Special Counsel is to conduct investigations and bring complaints before the Board.

### V.

The petitioner also alleges that the Board failed to consider the fact that her initial letter of reprimand was the result of a conspiracy. This conspiracy allegedly involved Colonel Mutter, management personnel under his command and the union.

According to the petitioner, that conspiracy was aimed at removing her from her position on the EEO Advisory Committee and ultimately from her job.

■ The basic facts surrounding the aforesaid letter of reprimand are not seriously disputed. The petitioner admitted in her response to the letter of reprimand that she failed to do the work assigned to her and that she told her supervisor to "get out of [her] face" when her supervisor attempted to explain the assignment. The petitioner denies that she called her supervisor a "white man's nigger", but does admit that she told her supervisor that she was being used merely because she was black. The ALJ carefully and fully considered all of the evidence and determined that the facts recited in the letter of reprimand were accurate. This court continues to hold that such determinations of credibility are "virtually unreviewable". *See Hambsch v. Department of Treasury,* 796 F.2d 430, 436 (Fed.Cir.1986). The ALJ specifically found as a matter of fact that the petitioner had an undisguised contempt for agency management which she maintained was the result of an ongoing conspiratorial pattern of discrimination. The ALJ found that petitioner's subjective perception of the situation was without merit. That conclusion is clearly supportable from this record.

### VI.

■ The petitioner further claims that harmful procedural error was committed by the agency when she was placed on paid administrative leave during the notice period of the removal action. This notice period began on January 23, 1988, when the petitioner was provided a notice of proposed removal. Her leave ended on March 4, 1988, when a decision of removing the petitioner from her position was made. The petitioner fails to cite any authority including statutory provision, regulation or case authority which would prevent the agency from placing her on the administrative leave. The ALJ found that the petitioner was neither suspended nor was her salary reduced during this period. Thus,

the ALJ found that this claim was without merit.

Suspension is defined as "the placing of an employee, for disciplinary reasons, in a temporary status without duties and pay". *See* 5 U.S.C. § 7501(2). The petitioner was provided full pay during the notice period and therefore was not suspended. *See Martel v. Department of Transportation, FAA,* 735 F.2d 504 (Fed.Cir.1984). Since her pay was not reduced, there is simply no adverse action from which the petitioner can appeal to contest her placement on administrative leave.

### VII.

■ The petitioner also asserts that the removal penalty applied by her agency was disproportionate to her offense. The choice of penalty for employee misconduct is left to the agency's sound discretion. *See Miguel v. Department of the Army,* 727 F.2d 1081, 1083 (Fed.Cir.1984). This court has also held that it will not disturb an agency's choice of penalty unless the severity of its actions appears totally unwarranted in light of all the relevant factors. *See DeWitt v. Department of the Navy,* 747 F.2d 1442, 1445 (Fed.Cir.1984), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1759, 84 L.Ed.2d 822 (1985).[4]

■ In this case, the agency considered the petitioner's prior reprimand, the impact of her action upon her working relationship with her supervisors, her potential for rehabilitation, the table of penalties, as well as her good record of duty performance. The ALJ noted in this context that petitioner's actions were "unfounded .... malicious, insolent and abusive in both substance and tone." He also recognized that

given her prior actions "a lesser penalty in this instance would not meet with success in restoring acceptable standards and behavior." In *Stanek v. Department of Transportation,* 805 F.2d 1572, 1580 (Fed. Cir.1986), this court held that where an employee had ignored various warnings and reprimands by his supervisors regarding his unauthorized activities, additional reprimands or suspensions would be insufficient to deter repeating conduct. There, as here, removal was appropriate.

### VIII.

■ Finally, the petitioner alleges that the agency removed her because of letters she wrote to her congressman. However, there is no evidence to support that assertion in the record. This argument was considered by the ALJ and rejected. There is no reason to disturb that conclusion.

### IX. CONCLUSION

The ALJ and the Board gave careful consideration to each and every individual charge of this petitioner. The ALJ and the Board carefully complied with the relevant administrative procedures. A thorough review of this entire record demonstrates that the decision of the Board upholding the petitioner's removal should be and is hereby

**AFFIRMED.**

---

4. *Department of Navy v. Egan,* 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988) is generally instructive on the inhibitions that prevail when the Board reviews agency decisions.