NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**JAIME GUMBS,**
*Petitioner*

v.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES,**
*Respondent*

---

2014-3194

---

Petition for review of the Merit Systems Protection Board in No. DA-0752-13-0648-I-1.

---

Decided: August 12, 2015

---

JAMES MASON LOOTS, Law Office of James M. Loots, PC, Washington, DC, argued for petitioner.

WILLIAM JAMES GRIMALDI, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent. Also represented by BENJAMIN C. MIZER, ROBERT E. KIRSCHMAN, JR., ALLISON KIDD-MILLER; NIGEL GANT, TONYA SAVAGE, Office of General Counsel, United States Department of Health and Human Services, Dallas, TX.

---

Before DYK, MOORE, and CHEN, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* CHEN.

Dissenting opinion filed by *Circuit Judge* DYK.

CHEN*, Circuit Judge.*

Dr. Jaime Gumbs appeals from a final order of the Merit Systems Protection Board (Board) which adopted the initial decision of an administrative judge and sustained Dr. Gumbs' removal from the Indian Health Service, Pawnee Health Center (agency) based on the charges of failing to maintain a valid medical license and practicing medicine without a valid license. *Gumbs v. Dep't of Health and Human Servs.*, No. DA-0752-13-0648-I-1 (MSPB July 10, 2014) (*Final Order*). Because substantial evidence supports the Board's findings sustaining the agency's charges against Dr. Gumbs, and the Board did not abuse its discretion in determining that the penalty for Dr. Gumbs's misconduct was reasonable, we affirm.

## BACKGROUND

Dr. Gumbs was employed with the Indian Health Service (IHS) as a General Practice Medical Officer in the Pawnee Service Unit in Pawnee, Oklahoma (clinic) for almost 22 years. The clinic operates with the permission of several Native American tribes in the area to provide medical care for members of those tribes. Joint Appendix (J.A.) 55. As a medical officer, Dr. Gumbs was subject to the Bylaws, Rules, and Regulations of the Medical Staff of the United States Public Health Service, Pawnee Service Unit, IHS (bylaws). Under these bylaws, Dr. Gumbs was required to have a current, full, and unrestricted medical license. J.A. 111. The bylaws also required Dr. Gumbs to be fully credentialed prior to seeing patients at the clinic. J.A. 116.

For most of his employment at the agency, Dr. Gumbs was licensed to practice medicine by the Commonwealth of Puerto Rico (Puerto Rico). He is not licensed by any other state or territory to practice medicine. At some point, Dr. Gumbs began to experience administrative difficulties and delays in renewing his medical license with the Puerto Rico Department of Health, Office of Regulation and Certification of Health Professionals (medical board). J.A. 93.

According to Dr. Gumbs, when seeking to renew his medical license in 2007, the Puerto Rico medical board's computer system failed to timely process his application, and as a result, his license lapsed. Dr. Gumbs informed his supervisor, Dr. Steven P. Sanders, director of the IHS clinic, that his license had inadvertently expired. Dr. Gumbs was without an active medical license for about a month as he waited for the Puerto Rico medical board to renew his license. During this period, Dr. Gumbs did not see patients or perform any of his job responsibilities. At this time, Dr. Sanders did not place Dr. Gumbs on leave without pay status or file a formal disciplinary action against him.

The next renewal date for Dr. Gumbs' license was in 2010. According to Dr. Gumbs, the medical board's web site again failed during the renewal application process, and thus the renewal of his license was again delayed. *Id.* Despite these administrative difficulties, Dr. Gumbs received his renewed license three days before it was scheduled to expire. *Id.*

In 2013, Dr. Gumbs again allowed his medical license to lapse. Dr. Gumbs' license was set to expire on May 8, 2013, and he began the application process for renewal of his license in February of that year. According to Dr. Gumbs, the Puerto Rico medical board's online portal was experiencing technical difficulties when he attempted to access the site during the month of February. Dr. Gumbs

next attempted to access the site three weeks later in March. According to Dr. Gumbs, the site was again experiencing difficulties. In April, Dr. Gumbs enlisted the help of a physician co-worker at the clinic who also had experience renewing his license with the Puerto Rico medical board. Nevertheless, even with his co-worker's help, Dr. Gumbs was unable to complete his license renewal application online. During this period of time, Dr. Gumbs informed Dr. Sanders as well as Kristie Choate, the clinic's credentialing officer, that he had not yet renewed his medical license.

Unable to complete his license renewal online, on April 22 Dr. Gumbs sent a paper copy of his license renewal application to the medical board with a money order of $150 to cover what he believed to be the renewal fee. The application was received by the medical board on April 29. On May 7, Dr. Gumbs informed Dr. Sanders and Ms. Choate that his license had not been renewed, and that it would expire by the next day.

Dr. Gumbs' license expired at midnight on May 7. Although aware that his license had expired, Dr. Gumbs arrived at work on May 8 and began his normal rounds. He evaluated a patient, prescribing medication to treat that patient. J.A. 99–105. Dr. Gumbs was in the middle of examining a second patient when he was interrupted by Dr. Sanders, who ordered him to stop treating patients. Dr. Sanders had just been informed by Ms. Choate that Dr. Gumbs' license had not been renewed and thus had expired. Dr. Gumbs was thereafter reassigned to the medical records department, and was not permitted to see any other patients.

Dr. Gumbs then learned he had not yet submitted a complete license application because he had not included the full required renewal fee with his application. J.A. 95. On May 9, Dr. Gumbs purchased a money order for an additional $100—the amount still owed to the Puerto Rico

medical board. The medical board received Dr. Gumbs' full renewal fee on May 15, which completed his license renewal application. *Id.* The next day, on May 16, the medical board called Dr. Gumbs to inform him that his now-completed application had been accepted and that he would receive a renewal of his medical license by e-mail. *Id.* The renewal was dated May 16, the day the licensing authority received and cashed the money order submitted by Dr. Gumbs in order to complete his license renewal application. *Id.*

In a letter dated May 22, 2013, Dr. Sanders notified Dr. Gumbs that he was proposing to remove him based on his failure to maintain a valid medical license and his practice of medicine without a valid medical license. On June 18, 2013, Dr. Travis Scott, Chief Executive Officer of the clinic, notified Dr. Gumbs that he had decided to remove him from his position for "(1) Failure to maintain a valid medical license, and (2) Practice of medicine without a valid medical license." J.A. 82.

Dr. Scott explained that "[m]aintaining a valid medical license [wa]s a condition of employment," and although Dr. Gumbs was aware of the difficulties in renewing his medical license from the Puerto Rico medical board, he had not accepted responsibility for the untimeliness in obtaining that renewal. *Id.* Dr. Scott noted that Dr. Gumbs treated a patient after expiration of his medical license, and was in the middle of evaluating another patient when Dr. Sanders instructed him to stop. *Id.* Dr. Scott explained that it was Dr. Gumbs' "responsibility to recognize that [he] d[id] not have authorization to practice medicine without a medical license." *Id.* Dr. Scott continued that "[t]hese requirements are clearly stated in the Medical Staff By-laws." *Id.* Dr. Scott explained that Dr. Gumbs's misconduct exposed the clinic to liability. *Id.*

When selecting removal over a lesser penalty, Dr. Scott explained that Dr. Gumbs held a position that

required a medical license, and that his failure to maintain such a license adversely impacted the clinic. Dr. Scott considered Dr. Gumbs's lengthy service and awareness of the clinic's bylaws, and also provided an analysis justifying Dr. Gumbs's proposed removal under eleven of the twelve factors identified in *Douglas v. Veterans Admin.*, 5 M.S.P.B. 313, 332 (1981).

Dr. Gumbs timely appealed the agency's action removing him from service. *Gumbs v. Dep't of Health and Human Servs.*, No. DA-0752-13-0648-I-1 (MSPB Nov. 7, 2013) (*Initial Decision*). An administrative judge found the agency had proven both charges forming the basis of Dr. Gumbs's removal by a preponderance of the evidence: that Dr. Gumbs failed to maintain a valid medical license and that Dr. Gumbs practiced medicine without a license. *Initial Decision* at 2–10. The judge determined that in view of the sustained charges, the agency's penalty of removal was reasonable. *Id.* at 10–12.

Dr. Gumbs petitioned for review of the Board's initial decision, arguing that it was contrary to evidence, that the clinic's action did not promote the efficiency of the service, and that the penalty of removal was not reasonable. The Board denied this petition and affirmed the initial decision, finding that Dr. Gumbs had not shown error in the administrative judge's findings, that the agency had established a nexus between Dr. Gumbs' misconduct and an adverse effect on the agency's operations, and that in view of the sustained charges, the penalty of removal was reasonable. *Final Order* at 2–6. Dr. Gumbs timely appealed the Board's Final Order. We have jurisdiction over Dr. Gumbs' appeal pursuant to 28 U.S.C. § 1295(a)(9).

## DISCUSSION

Our review of Board decisions is defined narrowly and limited by statute. *E.g.*, *Graybill v. United States Postal Serv.*, 782 F.2d 1567, 1570 (Fed. Cir. 1986); *Maddox v.*

*Merit Sys. Prot. Bd.*, 759 F.2d 9, 10 (Fed. Cir. 1985). We must affirm a Board decision unless it is 1) arbitrary or capricious or not in accordance with law, 2) obtained without procedures required by law, rule, or regulation having been followed, or 3) unsupported by substantial evidence. 5 U.S.C. §§ 7703(c)(1)–(3); *Hayes v. Dep't of the Navy*, 727 F.2d 1535, 1537 (Fed. Cir. 1984).

I

Dr. Gumbs does not challenge the Board's finding that his medical license expired, which supported the agency's charge that Dr. Gumbs failed to maintain a valid medical license. Appellant's Br. 2 ("[T]here was a seven-day lapse between expiration of [Dr. Gumbs's] existing license and issuance of a renewed one."). Indeed, there is no dispute that Dr. Gumbs did not submit a complete license renewal application until May 15, 2013, when the medical board received Dr. Gumbs' full license renewal application fee. J.A. 95; *see also* Letter from parties, Dkt. No. 72 ("[T]he parties agree the record shows that, as of the morning of May 8, 2013, Dr. Gumbs owed the Puerto Rico licensing authority an additional $100.").

Instead, Dr. Gumbs challenges the Board's finding that he practiced medicine without a license. Dr. Gumbs argues that he only saw a single patient. He notes that Dr. Sanders eventually reviewed and completed the medical records associated with that patient. Dr. Gumbs also asserts there is no evidence he actually performed any services or engaged in any activities that morning for which a medical license was expressly required. However, the record shows that Dr. Gumbs reviewed a patient's medical history, conducted a physical, and then prescribed and signed off on treatment and medication to that patient. J.A. 32–33; 99–105. There is no dispute he was purporting to act as a doctor, and not a paraprofessional or medical assistant. Second, while Dr. Sanders subsequently reviewed the medical records for the patient

evaluated by Dr. Gumbs, Dr. Sanders' subsequent review does not erase the fact that it was Dr. Gumbs—and not Dr. Sanders—who actually saw, evaluated, and prescribed treatment for the patient. Thus, although Dr. Gumbs attempts to justify his conduct on the morning of May 8, his explanation does not negate the substantial evidence supporting the Board's finding that he practiced medicine without a valid license.

## II

Dr. Gumbs also challenges the Board's finding that his removal promoted the efficiency of the agency's service. A federal agency may discipline an employee "only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a). The agency must demonstrate a "nexus" between the employee's misconduct and "an adverse effect upon the agency's functioning." *Mings v. Dep't of Justice*, 813 F.2d 384, 389–90 (Fed. Cir. 1987). We uphold a Board's finding of a "nexus" if it is supported by substantial evidence. *Brown v. Dep't of Navy*, 229 F.3d 1356, 1358 (Fed. Cir. 2000).

Dr. Gumbs argues that because nothing in the record shows that he provided anything but routine, quality medical care at the clinic on May 8, there was no risk of negative repercussions from his action. Dr. Gumbs minimizes, however, the potential negative repercussions that could have resulted from his misconduct. As the Board found, Dr. Gumbs' misconduct "not only threatened the trust of the Native American community, but also exposed the agency to liability." *Final Order* at 5.

The failure to maintain a valid medical license and the practice of medicine without such a license were "a violation of [the] Joint Commission Accreditation Standard[s]," J.A. 36, and a violation of the clinic's bylaws. *Final Order* at 4; J.A. 82. For example, the clinic's bylaws require all medical professionals to "[h]old a current, full and unrestricted license to practice as a licensed inde-

pendent practitioner (i.e., Medical / Osteopathic Physician . . .) in the United States, or Territory of the United States." J.A. 111. The bylaws also require medical practitioners to "be fully credentialed prior to seeing patients in the [clinic]." J.A. 116. Thus, even accepting that Dr. Gumbs provided "routine quality care" without his license, it is the practice of medicine without a license *itself* that forms the basis of his misconduct.

As Dr. Scott explained in his proposal to remove Dr. Gumbs from his position, the mission of the agency is to provide "the best health care possible at the highest level for the American Indian/Alaska Natives in the tribal community." J.A. 85. Dr. Gumbs occupied a position with regular contact with the public and became well-known to the patients and to the population of the community at-large. *Id.* Dr. Scott explained that Dr. Gumbs' "lack of responsibility to ensure he maintained a valid license affect[ed] the mission of the [clinic] to provide clinical services" to those in this community. In particular, Dr. Scott asserted that if Dr. Gumbs' unlicensed practice of medicine became known to the Native American community, it was "the experience of the [agency] that this becomes newsworthy and adversely impacts the reputation of the agency." J.A. 86.

In addition, Dr. Scott noted that Dr. Gumbs was well aware of the requirements to maintain his medical license, and even though he knew that his license had expired, chose to place the clinic at risk by providing unlicensed medical care. J.A. 85. This placed the clinic in violation of its own bylaws and exposed the agency to tort liability by creating a presumption that both Dr. Gumbs and the clinic were providing negligent care. J.A. 82–83.

Dr. Gumbs' characterization of the harm from his unlicensed practice of medicine as "speculative" misses the point because it does not account for the mission of the agency. As explained by Dr. Scott, it is important to the

clinic to maintain the trust of the Native American community, and any lapse of responsibility to maintaining adequate standards—such as by violating its own by-laws—threatened to break that trust. *See* J.A. 36. Even if no harm to the agency specifically resulted from his treatment of the patient on May 8, on a more general level, Dr. Gumbs' misconduct had the potential to cause significant harm to the agency if it caused the Native American community to perceive that the clinic was not adhering to its internal procedures and was not dedicated to providing responsible medical care. In short, substantial evidence supports the Board's finding of a nexus between Dr. Gumbs' misconduct and an adverse effect on the agency.[1]

## III

Dr. Gumbs also argues that the penalty of dismissal was disproportionate and unreasonable. He contends that his misconduct did not warrant removal from his position and that Dr. Scott should have given consideration to alternative penalties. Consideration of an appropriate penalty is a matter committed primarily to the discretion of the employer and can be reversed only for an abuse of discretion. *See Lachance v. Devall*, 178 F.3d 1246, 1251 (Fed. Cir. 1999); *Villella v. Dep't of the Air Force*, 727 F.2d 1574, 1576 (Fed. Cir. 1984). The penalty

---

[1]  Dr. Gumbs also argues that his removal denigrated the agency's mission by delaying patient care and increasing the workload of the remaining care providers while IHS was hiring a new physician. But the focus of the efficiency inquiry is its impact of the employee's misconduct on the agency, not the impact of the imposed penalty itself. *See Mings*, 813 F.2d at 389–90. While Dr. Gumbs' allegations may be true, they do not negate evidence of a nexus between Dr. Gumbs' misconduct and an adverse effect on the agency.

must be reasonable in light of the sustained charges, and we have "effectively defined reasonable in this context to mean merely that the agency's choice of penalty not be grossly disproportionate to the offense." *Webster v. Dep't of Army*, 911 F.2d 679, 685 (Fed. Cir. 1990) (internal quotations omitted).

Here, the Board evaluated the reasonableness of the agency's penalty after consideration of several relevant factors laid out in *Douglas*, 5 M.S.P.B. at 332.[2] In partic-

---

[2]    The *Douglas* factors are: 1) the nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated; 2) the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position; 3) the employee's past disciplinary record; 4) the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability; 5) the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's work ability to perform assigned duties; 6) consistency of the penalty with those imposed upon other employees for the same or similar offenses; 7) consistency of the penalty with any applicable agency table of penalties; 8) the notoriety of the offense or its impact upon the reputation of the agency; 9) the clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question; 10) the potential for the employee's rehabilitation; 11) mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or

ular, because Dr. Gumbs failed to maintain a condition of his employment—holding a valid medical license—the Board determined the most relevant *Douglas* factors were 1) the nature of the offense, 2) its effect on his job performance, and 3) the availability and effect of alternative sanctions. *Final Order* at 6. The Board found that the agency properly considered the seriousness of the charge of practicing medicine without a license, the fact that Dr. Gumbs, as a condition of his employment was required to maintain his license and be fully credentialed before treating patients, and the fact that Dr. Gumbs knew his license had expired yet still decided to practice medicine, which exposed the agency to liability and jeopardized the Native American community's trust in the clinic. *Id.* The Board explained that although Dr. Scott was aware that other options existed, based on the sustained charges, removal was not an unreasonable penalty due to the gravity of Dr. Gumbs' misconduct. *Id.* at 7.

Dr. Gumbs argues that because the lapse of his medical license was unintentional and inadvertent, and that his misconduct was not willful and did not appear to result in any actual harm, a lesser sanction would have been more appropriate. But our role is not to reweigh anew the evidence before the Board. Dr. Scott explained

---

provocation on the part of others involved in the matter; and 12) the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others. *Douglas*, 5 M.S.P.B. at 332. We have approved the use of these factors for determining the reasonableness of a penalty. *Zingg v. Dep't of Treasury, IRS*, 388 F.3d 839, 841 (Fed. Cir. 2004). However, the factors listed in Douglas are not exhaustive, and an agency is required only to consider those factors relevant to the action. *Bryant v. Nat'l Sci. Found.*, 105 F.3d 1414, 1418 (Fed. Cir. 1997).

that although a lesser sanction was possible, he believed Dr. Gumbs need to be removed "to make sure that [Dr. Gumb's misconduct] d[idn't] happen again at [the clinic]." J.A. 48. We find no abuse of discretion in the Board's determination that the agency's penalty, in view of the sustained charges that Dr. Gumbs let his license expire and then practiced medicine without a license, is not unreasonable.

## AFFIRMED

### COSTS

No costs.

NOTE: This disposition is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

---

**JAIME GUMBS,**
*Petitioner*

v.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES,**
*Respondent*

---

2014-3194

---

Petition for review of the Merit Systems Protection Board in No. DA-0752-13-0648-I-1.

---

DYK, *Circuit Judge, dissenting.*

The majority affirms a decision of the Merit Systems Protection Board ("Board") sustaining the Department of Health and Human Service's (the "agency") removal of Dr. Jaime Gumbs from his position as a medical officer at the Indian Health Service, Pawnee Health Center, in Oklahoma, for allowing his medical license to lapse and treating one or two patients after the license had lapsed. I respectfully dissent.

## I

The agency and the Board viewed Dr. Gumbs' allowing his medical license to lapse and treating one or two patients as a serious matter. The agency's deciding official relied on a finding that "practicing medicine without a license is illegal in all states," J.A. 82, and a "violation of laws regulating licensure requirements," J.A. 86. The deciding official further found that Dr. Gumbs' conduct exposed the agency to "potential liability issues," J.A. 85. The Board's initial decision relied on the agency's finding that Dr. Gumbs' conduct was "a violation of law." J.A. 22. And the full Board affirmed, finding that removal was reasonable under the circumstances in part because of "the seriousness of the charge of practicing medicine without a license and the fact that the appellant's actions exposed the agency to liability." J.A. 6.

It is far from clear that, as the Board assumed, Dr. Gumbs' license had in fact lapsed. Dr. Gumbs applied to renew his medical license no later than April 22, 2013, prior to its expiration on May 7, 2013, and submitted a $150.00 fee. If the proper amount had been submitted, it appears that the license would have been extended automatically. Under both Oklahoma (where all of the conduct at issue occurred) and Puerto Rico (where Dr. Gumbs was licensed to practice medicine) law, it appears that the filing of a timely renewal application extends the license term. Oklahoma Stat. tit. 75, § 314(B) provides:

> Except as otherwise prohibited by law, *if a licensee has made timely and sufficient application for renewal of a license or a new license with reference to any transfer of an activity of a continuing nature, the existing license does not expire* until the application has been finally determined by the agency.

*Id.* (emphasis added). Under Puerto Rico law, the Medical Discipline and Licensure Board "*may* suspend the license of any physician . . . who does not submit the information required for the register every three years, for the term it deems convenient, contingent upon the facts involved in each case." P.R. Laws Ann. Tit. 20, § 134(c) (emphasis added). But "once the person meets the requirement of submitting such information, his/her license shall be activated by the Board." *Id.* Thus, it appears that under Puerto Rico law, even when a physician fails to timely renew a medical license, it is likely that the license does not automatically terminate.

According to Dr. Gumbs' May 27, 2013, letter to the deciding official regarding the notice of proposed removal, he "sent the required application and documents with the money that was asked for on the web site well in advance of any deadline for renewal." J.A. 95. Dr. Gumbs also acknowledged that he "later found out" that the licensing authority "wanted another $100.00," so he sent the remaining $100 on May 15th, 2013. *Id.*

The government argues on appeal, and the majority agrees, that the failure to make the additional $100 payment resulted in the lapse of his license. But it is not clear under either Oklahoma or Puerto Rico law that the failure to make the full payment caused the license to lapse since the application was otherwise complete. This is a matter for the Board in the first instance, and the Board did not address the issue. In my view, the majority errs by deciding the issue without a remand.

Even if we could properly assume that Dr. Gumbs' license lapsed because he failed to timely submit $100 of the license renewal fee, the Board's action in sustaining the penalty of removal would have been arbitrary and capricious.

First, it is unclear whether either Oklahoma or Puerto Rico law would have regarded Dr. Gumbs' continuing to practice as criminal, or even particularly serious. Here, neither the agency nor the Board cited any criminal statute or regulation that Dr. Gumbs violated. Instead, the agency relied on its conclusory assumption that Dr. Gumbs' conduct was "illegal in all states," J.A. 82, but did not even attempt to analyze his conduct under Oklahoma or Puerto Rico law, where his conduct may not have constituted a criminal violation. We have held that where an agency removes an employee based on a finding that conduct was criminal, but the conduct may or may not have been criminal, a remand is required. *See Doe v. Dep't of Justice*, 565 F.3d 1375, 1383 (Fed. Cir. 2009) (reversing and remanding "[b]ecause it seems probable that Doe was disciplined at least in part because the deciding official mistakenly believed that his misconduct was in violation of the law"). Under *Doe*, therefore, since part of the basis for Dr. Gumbs' removal was the agency's potentially mistaken belief that his conduct was criminal, a remand for consideration of a lesser penalty is required.

Second, even if the Board properly assumed that Dr. Gumbs' actions were technically illegal, the penalty of removal was still arbitrary and capricious, particularly since Dr. Gumbs may have assumed that his license renewal was complete.[1] It is true that we "defer[] to the

---

[1] The majority asserts that Dr. Gumbs was "aware that his license had expired," Maj. Op. 4, but the record is unclear on this point. According to Dr. Gumbs, he "was expecting that [he] would be receiving the renewal" on May 8, 2013, and did not realize until later that he still owed $100 for the license renewal. J.A. 95; *see also* Letter from parties at 2, Dkt. No. 72 ("As of [May 8, 2013], despite repeated inquiry Dr. Gumbs had no reason to

agency's choice of penalty unless the penalty exceeds the range of permissible punishment specified by statute or regulation, or unless the penalty is so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion." *Archuleta v. Hopper*, 786 F.3d 1340, 1352 (Fed. Cir. 2015) (internal quotation marks omitted). But even where all of the agency's charges are sustained, that deference is not absolute. *See, e.g.*, *O'Keefe v. U.S. Postal Serv.*, 318 F.3d 1310, 1313 (Fed. Cir. 2002) ("When all of the agency's charges are sustained, the agency's original penalty may nevertheless be mitigated to a maximum reasonable penalty when the agency's penalty is too severe." (citing *Lachance v. Devall*, 178 F.3d 1246, 1260 (Fed. Cir. 1999)). In prior cases, we have reversed agency penalty determinations in similar circumstances where the punishment did not fit the crime, even where the employee's conduct was unlawful.

In *Miguel v. Department of the Army*, 727 F.2d 1081 (Fed. Cir. 1984), a cashier was removed for "unauthorized possession of U.S. Government property" for admittedly stealing two bars of soap with a total value of $2.10. *Id.* at 1082. We reversed: "We do not condone theft regardless of the amount involved, but the relatively minor nature of the theft leads us to the conclusion that this harsh discharge of a 24-year employee with an otherwise unblemished record was a penalty grossly disproportionate to the offense and thus was an abuse of discretion." *Id.* at 1084; *see also Abrigo v. U.S. Postal Serv.*, No. 88-3390, 1989 WL 59271, at *1 (Fed. Cir. June 7, 1989) (unpublished) (vacating and remanding removal for misdemeanor unauthorized entry "where the penalty imposed [wa]s so disproportionate as to constitute an

---

know that there was anything amiss with his application for renewal.").

abuse of discretion" and "[t]he agency and the [B]oard gave absolutely no consideration to the . . . apparently technical nature of the violation").

Similarly, in *VanFossen v. Department of Housing & Urban Development*, 748 F.2d 1579 (Fed. Cir. 1984), an appraiser (VanFossen) was removed "based on three charges of violating the standards of conduct: engaging in outside employment without authorization; engaging in improper outside employment; and failing to disclose financial interests." *Id.* at 1580. VanFossen had more than nineteen years of federal service with no prior disciplinary record. *Id.* He had previously requested and received approval for outside employment from an area manager, but under applicable regulations this approval was not legally sufficient because it needed to come from the agency's regional counsel. *Id.* We vacated and remanded to determine an appropriate lesser penalty. *Id.* at 1581.

Here, Dr. Gumbs has had nearly twenty-two years of federal service, with no prior disciplinary record. At worst, his medical license lapsed for a period of nine days because he failed to pay $100 of the application fee, despite his "many attempts to get his medical license renewed" prior to the deadline. J.A. 3. And on the morning after his license may have expired, Dr. Gumbs saw a patient or two, whose records were then reviewed by his supervisor.

Our prior cases reflect an important responsibility to remand for determination of a more appropriate penalty in the rare case where the agency's choice of penalty is grossly disproportionate to the offense. In my view, this is such a case, and I respectfully dissent.